M. G. ASTLEFORD and JANE Z. ASTLEFORD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Astleford v. Commissioner
Docket No. 3433-71.
United States Tax Court
T.C. Memo 1974-184; 1974 Tax Ct. Memo LEXIS 135; 33 T.C.M. (CCH) 793; T.C.M. (RIA) 74184; July 11, 1974, Filed. Dennis M. Mathison, David E. Weiss, Jr., for the petitioners. Robert H. Burgess, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income tax of petitioners as follows: 1963
$ 47,950.45
1964
147,672.38
1966
75,383.94
Total
$ 271,006.77
The principal issue presented is whether a bad debt loss of $609,658.61 sustained by petitioners' partnership in 1966 may be deducted as a business bad debt or an ordinary loss or whether it is deductible *136 only as a nonbusiness bad debt. In addition, we must decide whether the partnership's basis in the bad debt is $350,000 less than claimed by petitioners. The taxable years 1963 and 1964 are before the Court solely by reason of carrybacks of the loss claimed for the taxable year 1966. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference. Petitioners are husband and wife. They resided at Savage, Minnesota at the time they filed their petition herein. They filed their joint Federal income tax returns for the taxable years 1963, 1964, and 1965 with the district director of internal revenue at St. Paul, Minnesota. Petitioners organized a partnership on November 1, 1944, named M.G. Astleford Company, sharing in profits and losses 75 percent to Mr. Astleford and 25 percent to Mrs. Astleford. The partnership was organized to assume construction activities and acquire equipment of the M.G. Astleford Co., Inc., upon the retirement of its majority shareholder, W. C. Schneider. The partnership actively conducted the business of highway construction grading and also engaged in private commercial grading *137 until June 1, 1946, when it joined with the McLean Construction Co. to form a partnership to engage in highway construction. After the formation of the McLean-Astleford Co. partnership, the M.G. Astleford Co. partnership continued in the private grading business and also rented some of its equipment to the McLean-Astleford Co. partnership. The Astleford partnership also built and rented a building to Astleford Equipment Co. and International Harvester Truck Agency for use in their sales and service activities. The private commercial grading business of the partnership continued until 1953 and the partnership began to engage in the activities of promoting and financing various ventures in the road construction business. From 1947 to 1966 the partnership owned interests in the following enterprises: Name of Enterprises
Ownership Interest a. Armel Construction Co.
50%
b. Dresser Trap Rock Co.
5%
c. Earth Movers, Inc.
50%
d. Bridge Builders, Inc.
50%
e. Astleford & Olsen
50%
f. Black Top Service Co. [1]
33-1/3%-66-2/3%
g. Rock Products, Inc.
50%
h. SunRay Shopping Center
25%
i. Warren Road Rocks, Inc.
100%
j. Prior Lake Concrete Products
33-1/3%
k. Sioux Corporation
50%
l. Mason, Hagen, Carter & Astleford
25%
m. Real Estate Investment, Inc.
66-2/3%
n. M.G. Astleford Co., Inc.
100%
o. Melroy Constructors, Inc.[2]
100%
p. McLean Astleford Co.
50%
q. Astleford Equipment Co.
66-2/3%
*138 On May 31, 1958, the partnership transferred its remaining construction equipment to the then dormant corporation, M.G. Astleford Co., Inc., for the purpose of reactivating the corporation in the construction industry. Since that time the partnership has not performed any construction activities but has instead concentrated on its promotional and financial activities. The financing arrangements undertaken by the partnership with the various enterprises were usually in the form of short-term loans to provide working capital. In some instances the partnership also lent money to relatives of petitioners and employees of their enterprises. The loans were reflected on the partnership books as "notes receivable" and the partnership earned and reported income from such loans as follows: Taxable Year Ended
Amount 10/31/58
$ 11,764.60
10/31/59
11,685.08
10/31/60
8,648.28
10/31/61
6,570.13
10/31/62
5,873.78
10/31/63
208.33
10/31/64
10,013.76
10/31/65
16,542.80
10/31/66
22,512.83
From *139 1958 through 1966 the partnership made over 100 loans (excluding the loans involved here). With the exception of one loan to Kievers Construction Co. and five loans to Twin City Excavating, the loans have been made to relatives of petitioners, employees, or business entities in which the partnership owned an interest. Over one-half of the loans were made to the M.G. Astleford Co., Inc. which was wholly owned by the partnership. In addition to its lending activities, the partnership invested in real estate and in corporations which owned real estate which investments had book values at October 31, 1966 as follows: Dakota Co.
$ 61,429.74
Hammer Property
7,925.00
Titus Property
65,122.90
St. Louis Park, Cambridge Ave.
8,800.00
Plymouth Township
80,417.70
St. Louis Park, Louisiana Ave.
137,201.92
Land Kenneth Connor
19,580.60
Scott County (Striff)
7,856.40
California (William Eastman)
24,097.67
Lakeville Township
49,650.00
Hiway 65 Anoka County
26,908.07
Schmidt Invest. Co.
23,361.14
Hiway 30 and E
35,150.00
Burnsville Township
10,000.00
Mineral Deposits 65 and 3
2,252.78
$559,753.92
Initially, the partnership held real estate for long-term *140 investment but, in recent years, it has held some property for sale to customers in the ordinary course of business. The partnership had no business policy as to whether it held a particular parcel of real estate as a long-term investment or for sale to customers in the ordinary course of its business. The partnership also purchased real estate for obtaining fill and gravel deposits which it sold to customers. It earned the following from sales of fill materials: Taxable years ended October 31
Amounts 1964
$ 2,484.85
1965
124,710.41
1966
20,693.45
1967
6.042.31
The partnership leased equipment to related businesses in the construction industry and earned the following amounts of rental income: Taxable years ended October 31
Amounts 1962
$ 1,500.00
1963
6,093.25
1964
2,268.41
1965
150.00
1966
59,854.19
In 1961, the partnership, acting through M.G. Astleford, [3] began to use the services of LeRoy J. Peterson to acquire real estate. Peterson located and negotiated the purchase of various properties and the partnership provided the purchase prices. If the property were later sold at a profit, the partnership was repaid the *141 capital it invested plus interest and the partnership and Peterson would share in the remaining profit equally. Peterson and the partnership usually operated under an informal oral agreement based primarily upon Astleford's personal confidence and trust in Peterson. On May 13, 1965, Peterson and the partnership held investments in land under their agreement in which Peterson's interest consisted of at least 171 acres of valuable property located in Michigan and Minnesota. In late 1964 Peterson traveled to California to inspect the David Weisz General Engineering Co. as a possible investment. [4] Following his investigation, he telephoned Astleford in January 1965, and attempted to interest him in acquiring the Weisz Co. as a potentially profitable venture. Astleford told Peterson that he was interested but did not, at that time, advance any money to Peterson. *142 After the telephone conversation with Astleford, Peterson began negotiations for the purchase of the Weisz Co. and began to participate in the daily management of the corporation. Shortly thereafter Mr. Astleford visited California and, after inspecting the operations, decided to provide short-term financing for the venture provided Peterson would remain in California as the chief officer and manager. On February 8, 1965, David Weisz, president of the Weisz Co., executed written agreements with Astleford and Peterson for the sale to them of the assets and assumption by them of the liabilities of the Weisz Co. The assets were to be transferred to Melroy Constructors, Inc., a California Corporation which Astleford and Peterson organized on February 15, 1965. They provided, among other things, that Melroy would take possession of certain earth-moving equipment of the Weisz Co. and assume liability for the unpaid balances on conditional sales contracts secured by the equipment. On the date of sale, the unpaid balances on the sales contracts were approximately $496,876.18. The agreements also provided for payment of $150,000 to David Weisz in annual installemnts of $50,000 on *143 February 8, 1966 and 1967, following an initial cash payment of $50,000. The initial payment on the date of sale was provided by Astleford out of partnership funds and the remaining payments were made by use of promissory notes with Melroy as maker. Although the sales agreements recited the Weisz Co. as seller and Melroy as purchaser, Weisz was induced to sell upon the strength of the financial statements of Astleford and the partnership and their guarantees of the unpaid installments. Melroy was organized primarily to engage in the business of grading and excavating real property and to develop and sell real property. Peterson served as president of Melroy, David Weisz acted as vice president and Astleford was secretary-treasurer. They also served as the three directors. Mr. Astleford received no salary from Melroy nor was he an employee but was reimbursed for travel expenses. At its initial meeting on April 1, 1965, the board of directors of Melroy voted to issue 100 shares of its capital stock at par value of $100 per share to Astleford in cancellation of $10,000 of the corporation's indebtedness to him. The indebtedness consisted of $52,000 advanced by Astleford to *144 Peterson from partnership funds. The partnership books reflected $42,000 as notes receivable from Melroy with the explanation, "part of $52,000 with $10,000 for stock." Following the initial issue of its 100 shares on April 1, 1965, Melroy issued no other stock although it was authorized to issue a total of 250 shares. After the advance of $52,000 to Peterson in February 1965, Peterson requested additional funds from Astleford because of an increase in business outlook for Melroy and the needs of Melroy to purchase or lease additional equipment. Astleford lent money direct to Melroy and also made rental payments to Shepard Machinery in behalf of Melroy. The largest of the loans was advanced to Melroy on March 9, 1965, and was evidenced by a promissory demand note in the amount of $60,000. The note had no interest rate on its face and was repaid on March 17, 1965. In May of 1965, Astleford discovered that Peterson lent $17,000 to a friend and the friend repaid the loan with a check which his bank refused to honor. Astleford considered Peterson's actions indicative of bad business judgment and decided that it would be in the partnership's best interests to go to California *145 and make some changes in the business organization. After discussing the matter with Peterson, Astleford agreed to continue as the financial benefactor of Melroy and also gave Peterson an option to purchase up to 99 percent of his stock in the corporation subject to certain conditions. In a separate agreement Peterson released his claims in various real estate ventures in which he and Astleford held joint interests. The value of the property interests released by Peterson was approximately $350,000. Both agreements were executed on May 13, 1965. The option agreement read, in part, as follows: THIS AGREEMENT was entered into this 13th day of May, 1965, by and between M. G. ASTELFORD, hereinafter referred to as ASTLEFORD; L. J. PETERSON, hereinafter referred to as PETERSON, and MELROY CONSTRUCTORS, INC., a California corporation, hereinafter referred to as CORPORATION, at Los Angeles, California. WHEREAS, Astleford is or will be the sole shareholder of all the outstanding capital stock of Corporation, and WHEREAS, Astleford has heretofore advanced certain sums of money to Corporation for its use and benefit, and WHEREAS, Astleford desires to sell and Peterson desires *146 to purchase a portion of said capital stock, and WHEREAS, Peterson is president of Corporation and in charge of its operations and affairs, and WHEREAS, Astleford has heretofore and will continue in the future to render services to the Corporation in an advisory capacity and will act as surety, if necessary, to secure Corporation's obligations and bonding requirements, and WHEREAS, the parties desire to repay the Corporation's obligation to Astleford in a feasible manner commensurate with the Corporation's ability to so repay and as expeditiously as possible, NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises and covenants herein contained and for other good and valuable consideration, receipt of which is hereby acknowledged by each of the parties hereto, the undersigned agree as follows: 1. Astleford does hereby offer to sell to Peterson, for the sum of $4,900.00, 49% of his right, title and interest in and to his shares of stock in Corporation, and further agrees to transfer and convey same, subject to the approval of any governmental agency concerned and in accordance with any applicable laws, upon payment of purchase price. Astleford *147 further and in addition to the foregoing offers to sell to Peterson for the sum of $5,000.00, 50% of his right, title and interest in and to the aforesaid shares of stock in Corporation, provided however that this offer shall not be effective unless and until at the time an acceptance is tendered that any and all personal obligations of Astleford that pursuant to this Agreement he may have incurred by virtue of acting as surety or guarantor for Corporation business are discharged. Either of the offers set forth hereinabove, may be accepted at the option of Peterson and subject to any conditions set forth therein, at any time prior to May 1, 1968, by giving written notice to Astleford thereof, and tendering said purchase price, provided further that prior to any such acceptance, the Corporation has repaid Astleford the sum of $62,750.00, represented by a promissory note in said amount executed by the Corporation in favor of Astleford simultaneously herewith. Astleford further agrees, that for and in consideration of the sum of $1.00, to him in hand paid by Peterson, receipt of which is hereby acknowledged, not to withdraw said offers prior to May 1, 1968. * * * 5. Astleford *148 agrees that forthwith upon demand by Corporation or Peterson, to act as surety for Corporation's obligations, in a sum not to exceed $100,000.00, provided further that this paragraph will not be effective after May 1, 1968 except for those surety obligations undertaken and incurred prior to said date. Astleford continued to advance money to Melroy in 1965. The advances were numerous and were evidenced by demand promissory notes and, with the exception of four of the notes which were made between June 1, 1965, and July 27, 1965, and repaid within a few days thereafter, all of them bore a stated interest rate of 6 percent per annum. During 1965 the partnership advanced $300,068.54 to Melroy and paid rentals on behalf of Melroy totaling $22,080. Despite the performance of grading work aggregating over $2,000,000 in receipts in 1965, Melroy realized a very small net profit and repaid few of the advances from the partnership. The partnership reported no interest income from such notes in 1965. Melroy began 1966 by completing contracts it had received in 1965, but it received no new grading contracts in 1966. It completed grading work in 1966 for approximately $600,000.As business *149 began to decline the partnership advanced additional funds to Melroy and paid creditors of Melroy. The loans to Melroy were evidenced by the same type of 6 percent demand promissory notes utilized by the parties in 1965. During 1966 the partnership advanced $88,851.46 to Melroy and paid rentals on behalf of Melroy totaling $386,862.75. None of the notes were repaid by Melroy in 1966, but the partnership did receive interest payments from Melroy in 1966 in the amount of $7,631.76 for interest accrued in 1965. Melroy did not accrue or pay interest on the notes in 1966. Beginning in April of 1966, Melroy was unable to make equipment payments and the partnership was forced to begin making the payments under its guarantees. With no prospects for future contracts it became apparent that Melroy must sell its equipment to meet its obligations. The holders of the obligations on the equipment demanded additional guarantees because the unpaid balances due them were greater than the market values of the equipment. They refused to allow the partnership to merely guarantee to make up the difference between the sales proceeds and the contract balances. Most of the equipment was sold *150 at auction on September 8, 1966, for less than the balances due under the contracts and the parnership paid the difference to the holders of the obligations. The partnership received equipment having a value of $71,898.91 after the auction. Melroy's loss was $488,273.35 in 1966 and it became completely insolvent. Melroy has continued to remain insolvent and unable to discharge any of its obligations to its creditors. On April 17, 1968, Melroy Constructors, Inc., and M. G. Astleford filed a civil law suit in the Superior Court of the State of California for the County of Los Angeles, against David Weisz General Engineering Co., David Weisz, Frank Spelly (trustee for Melroy), Leroy J. Peterson, Oxford Escrow Co., Peterson and Weisz Constructors, Inc., Waxman and Gross, a partnership (attorneys for Melroy) and Leonard Gross (attorney for Melroy). The complaint prayed for money damages and an accounting from the named defendants on such grounds as breach of fiduciary duty, malpractice and fraud. This suit was consolidated with another civil suit filed by Astleford against the David Weisz Co. and CRS Construction Co., and they were tried and judgment entered on April 13, 1972. The *151 judgment provided, among other things, that: (1) Melroy shall recover $40,000 with interest from the Weisz Co., and (2) Melroy shall recover $10,000 from David Weisz but execution was stayed until April 1975, and (3) Oxford Escrow which held $1,600 for Melroy was to pay the amount over to Irving Reifman, trustee and attorney for Astleford, and (4) The following lien creditors of Melroy would take precedence over Astleford: Lien Holder
Amount Internal Revenue Service
$10,000.00
Union Oil Co. of Calif.
5,797.39
and, (5) The action shall be dismissed with prejudice as to all other defendants, and (6) Plaintiff, M. G. Astleford, shall take nothing. David Weisz, the Weisz Co., and Leroy Peterson are all insolvent and the judgment entered by the court in California is uncollectable. The partnership claimed a deduction for bad debts of $611,108.61 on its return for the taxable year ended October 31, 1966 with no explanation of the deduction. Petitioners, on their return for the taxable year 1966, claimed a loss from partnerships of $539,896 which produced a net operating loss of $448,668.96 which they carried back to 1963 in the amount of $116,997.73 *152 and to 1964 in the amount of $331,671.23. In his statutory notice of deficiency the Commissioner disallowed as a business bad debt $609,658.61 which eliminated the net operating loss for 1966 and the net operating loss carryback to 1963 and 1964. He disallowed the deduction for bad debts on the grounds that it had not been established that a worthless debt arising from a debtor-creditor relationship existed on December 31, 1966, that funds transferred to Melroy represented contributions to capital but if a worthless debt did exist it was personal and not connected with a trade or business. Petitioners concede that the deduction for bad debts was overstated in the amount of $71,898.91 by reason of the receipt by the partnership of assets of Melroy at the time the equipment was sold. OPINION Petitioners were the sole partners of a partnership which advanced funds to their wholly owned corporation. The partnership also paid installments on conditional sales contracts covering equipment used by the corporation in its earth moving operations and on other obligations of the corporation. The corporation became insolvent in 1966 and petitioners claimed a business bad debt deduction *153 of $609,658.61. They have now conceded that the deduction does not exceed $537,759.70. The Commissioner disallowed the deduction on several grounds; i.e., that no debt was created, that worthlessness did not occur in 1966, and that if debt were created it was personal and not connected with a trade or business. In addition, the Commissioner, in his brief, raised for the first time a question as to the partnership's basis in the loss claimed. Respondent's position as to basis will not be considered because it is raised untimely. Theatre Concessions, Inc., 29 T.C. 754, 760 (1958), acq. 1958-2 C.B. 8. Whether the advances and installments paid by the partnership became worthless in 1966 is a question of fact. The date of worthlessness is fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope for the future. W. A. Dallmeyer, 14 T.C. 1282, 1291-1292 (1950). Respondent argues that at most only partial worthlessness was evident in 1966 because Mr. Astleford filed suit at a later time. After considering *154 all of the circumstances we conclude that there was no reasonable hope of recovery on October 31, 1966, when the partnership's taxable year ended. Melroy was hopelessly insolvent in 1966. Most of its assets were sold and the proceeds were inadequate to satisfy its obligations. The filing of the lawsuit in April 1968 is so remote in point of time that it casts little doubt on the hopelessness of recovery on October 31, 1966. We, therefore, hold that worthlessness occurred by October 31, 1966 and petitioners claimed the deduction in the year of worthlessness, 1966. The installments paid by the partnership on the corporation's liabilities on conditional sales contracts and on other obligations are classified no differently for tax purposes than the funds advanced directly to the corporation. Putnam v. Commissioner, 352 U.S. 82 (1956). The issues framed by the parties are whether the advances and payments by the partnership represent debt or equity and if they represent debt was the debt business or nonbusiness. *155 Whether the advances and payments represent debt or equity is a question of fact and, although the case law provides us with certain tests to apply, the countless variations in facts necessarily preclude finding a case in point. There is no single characteristic which is decisive in the determination of whether a debt exists or a risk investment has been made by the shareholder. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). The burden of proving the reality of the indebtedness is on the taxpayer. Trans-Atlantic Co. v. Commissioner, 469 F.2d 1189, 1191 (C.A. 3, 1972), affirming a Memorandum Opinion of this Court. In Fin Hay Realty Co. v. United States, 398 F.2d 694 (C.A. 3, 1968), the court examined the debt vs. equity issue using 16 criteria which we shall apply here. 1. The Intent of the Parties. - The partnership and corporation used debt instruments, conventional in form, to evidence their intent to create debt. If the attendant circumstances are to the contrary, however, this test is not conclusive. Kraft Foods Co. v. Commissioner, 232 F.2d 118 *156 (C.A. 2, 1956). 2. Identity Between Creditors and Shareholders. - The partnership is both the creditor and the sole shareholder of the corporation. 3. Extent of Participation in Management by the Holder of the Instrument. - Peterson actively managed the corporation when it acquired the assets of the Weisz Co. and he so continued but his actions were scrutinized by Astleford especially after May 1965 when Peterson lent corporate funds to a friend of his. The continuous need for additional funds from Astleford obviously carried with it constant reviews of the business of the corporation to justify additional advances. 4. Ability of the Corporation to Obtain Funds from Outside Sources. - No evidence was offered to show whether the corporation could borrow funds from sources other than the partnership but considering all the facts we think it was extremely unlikely that an unrelated party would lend the corporation any funds. 5. "Thinness" of the Capital Structure in Relation to Debt. - The corporation had $10,000 in capital stock outstanding throughout its existence. Its earned surplus on December 31, 1965 was $3,746.95 and its liabilities were $1,653,801.11. On December 31, 1966 the *157 corporation had a negative earned surplus of $484,526.40 and it owed liabilities of $615,069.55. The corporation was engaged in the earth moving business which required large investments in heavy equipment. A substantial part of the payments made on behalf of the corporation were installment payments on contracts for equipment which was essential to the conduct of its business. These facts present an obvious case of thin capitalization. 6. Risk Involved. - The risk of loss of principal was great in this case. In the year 1965 Melroy had gross sales of $2,226,477.34, yet it realized a taxable income of only $3,746.95. There is little evidence in the record of the relative success of the predecessor of Melroy and although Peterson may have been successful in locating profitable investments for the partnership, there was no showing that he possessed any expertise in operating a business engaged in earth moving. There was no showing of profitable contracts on hand assumed by Melroy which would lessen the risk involved in going into the construction business. We conclude that the risk was substantial. 7. Formal Indicia of the Arrangement. - The parties generally followed the *158 formal indicia by the use of promissory notes except in some insignificant instances where interest was not specified. 8. Relative Position of the Obligees as to Other Creditors Regarding the Payment of Interest and Principal. - The partnership was not subordinated to the claims of other creditors but a substantial amount of the corporation's liabilities were secured by heavy equipment which represented the principal assets of the corporation. Such circumstances left little of value to secure the advances and payments made by the partnership. 9. Voting Power of the Holder of the Instrument. - The partnership held all the voting power of the corporation.
10. Provision for a Fixed Rate of Interest. - The notes which bore interest provided for a fixed rate. 11. Contingency on the Obligation to Repay. - The obligations were unconditional as to repayment. 12. Source of the Interest Payments. - Interest accrued in 1965 was paid in 1966. It could have been paid from earnings but apparently Melroy was at the same time borrowing money from the partnership. 13. Presence or Absence of a Fixed Maturity Date. - All of the promissory notes were demand notes. 14. Provision *159 for Redemption by the Corporation. - There was no provision for redemption of the indebtedness by the corporation. 15. Provision for Redemption at the Option of the Holder. - The holder of the instruments had no option to redeem them. 16. Timing of the Advance with Reference to the Organization of the Corporation. - Of the first $52,000 advanced to Melroy, $42,000 was used to buy the business assets from its predecessor. The parties have not requested us to find as facts the details of all the advances to Melroy; nevertheless, the evidence bears out advances of substantial sums to Melroy shortly after its organization. After applying the foregoing tests to the facts before us we find that the advances to and payments on behalf of Melroy by the partnership did not represent debt but rather investments subjected to the risks of the business enterprise. No evidence was presented to indicate the working capital requirements of Melroy, so we are unable to determine if all of the advances and payments made on behalf of Melroy would represent risk capital. The small net profit on a large volume of sales in 1965, however, convinces us that the working capital requirements must *160 have been sizeable especially in light of notes and accounts receivable totaling $502,800.24 at the end of 1965. We hold, therefore, that a valid debt was not created and the loss in 1966 of the partnership's advances to and payments on behalf of Melroy of $537,759.70, was a capital loss deductible under the provisions of section 165(g) of the Code. [5]
Moreover, if we were to find that the $537,759.70 represented debt we would be called upon to decide whether the debt was business or nonbusiness. If we deemed it necessary to decide the case on that basis we would conclude that the loss was a nonbusiness bad debt deductible as a short-term capital loss under the provisions of section 166(d) of the Code. In view of our analysis of the debt vs. equity issue, no useful purpose would be served by setting forth in detail the reasons why we would also decide the case in favor of the respondent on the other grounds. Decision will be entered for the respondent. Footnotes
1. The partnership now owns 66-2/3%. It originally owned 33-1/3%. ↩
2. The partnership owned 100% of stock subject to a buy-sell agreement discussed, infra. ↩
3. Mr. Astleford conducted and supervised the business affairs of the Astleford partnership. As a general partner we assume his actions were binding on the partnership. ↩
4. The David Weisz Engineering Co. and the Weisz and Pickens Grading Corp. are referred to in common in the exhibits and briefs. For the purposes of this opinion we must assume that they are the same organization and they will hereinafter be referred to as the Weisz Co.↩
5. All code references are to the Internal Revenue Code of 1954 as amended. ↩