GENE H. BAIRD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baird v. Commissioner
Docket No. 11177-79.
United States Tax Court
T.C. Memo 1982-220; 1982 Tax Ct. Memo LEXIS 526; 43 T.C.M. (CCH) 1173; T.C.M. (RIA) 82220; April 26, 1982. *526 Charles E. Hammond, for the petitioner. James T. Million, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in the petitioner's Federal income tax: Taxable Year
Deficiency
1972
$ 56.96
1973
1,661.04
1974
17,063.56
1975
98,867.38
Due to concessions, the only issue before us is whether certain disbursements from a corporation to its sole stockholder were loans or dividends to the extent of earnings and profits. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner's Federal income tax return for the taxable years 1972 to 1975, inclusive, were filed with the Internal Revenue Service Center at Austin, Texas. At the time he filed his petition herein, petitioner resided in Merriam, Kansas. Petitioner has been involved in the wholesale liquor business in Kansas for many years. Prior to 1953, he worked as a salesman. In 1953, State Distributors, Inc., a wholesale liquor distributor (hereinafter "State") hired *527 petitioner as a salesman in a newly established territory in and around Hayes, Kansas, and sold him a small amount of Treasury stock. The new warehouse in petitioner's territory was poorly managed and had difficulty in delivering the goods which petitioner sold. He found himself actually helping to manage the warehouse, in addition to selling State's products. Consequently, Mr. Shicktanz, State's president, appointed petitioner branch manager of the Hayes territory, which position he held until 1970. During this time, he purchased more State stock, increasing his interest to about 7 percent. He was elected to State's board of directors and became a vice president. In 1970, petitioner learned that Eastern Distributing Company (Eastern), a larger company based in Kansas City, might be for sale. He persuaded State's stockholders to purchase Eastern, which he then managed after moving to Kansas City. Petitioner soon discovered serious employee morale problems in Eastern's work force which had not been disclosed by the sellers. Due to these problems, Mr. Schicktanz indicated that acquiring Eastern had been a mistake and that he would like State to sell its Eastern stock. After *528 obtaining outside financing, petitioner and Eastern's four principal salesmen purchased that company from State in 1973 and have operated it ever since. Petitioner, now owning a company in his own right, embarked upon an ambitious scheme of acquiring liquor distributorships which would, he hoped, make him a giant of the wholesale liquor business in Kansas. Due to the state law which prescribed wholesale liquor prices, the wholesale liquor distributorship business in Kansas was very costly and inefficient. Distributors competed for orders on the basis of non-price factors, such as product availability and quick delivery. Thus, it was necessary that every wholesaler stock every product (necessitating excessive inventory investments) and rush delivery trucks to the retailers ahead of the competition in hopes of securing an order. Small firms were having difficulty surviving and consequently the industry was marked by oligopolistic tendencies. Although petitioner lobbied for changes, he was a practical enough businessman to know that while prices remained fixed, an adequate return on invested capital could be obtained only by consolidating the operations of small companies and *529 eliminating excess inventories and personnel, and, thus, conforming to the oligopolistic pressures caused by state price control. This rationale undergirded petitioner's grand design. Petitioner first acquired Sunflower Sales Company in July 1974 and placed its assets in a new corporation, Southeastern Distributors. Petitioner then set his sights on C-K Distributors, Inc., which was the strongest wholesale business in Junction City, Kansas. Its president and one of its stockholders was a Mr. Rosewarren, who was highly respected in the community and was a very capable manager. The possibility of acquiring his services was a major reason for petitioner's interest in C-K. Petitioner negotiated the purchase of C-K with Mr. Rosewarren, who considered himself the representative of the other shareholders and was strongly protective of their interests. However, prior to consummating the purchase of C-K, petitioner purchased State in July 1974 after receiving an offer from and negotiating with Mr. Schicktanz. State then became a wholly owned subsidiary of Eastern. After the purchase of State, petitioner owned 82 percent of Eastern's common stock and 76 percent of Southeastern Distributors' *530 common stock. Eastern in turn owned 100 percent of State. Mr. Rosewarren was not pleased when he learned of petitioner's purchase of State, as State and C-K had historically been bitter rivals. It was petitioner's intention, however, to combine the operations of State and C-K under C-K's name in Junction City and achieve greater operating efficiency by eliminating excess inventory and personnel. After the combination, petitioner planned to have Rosewarren manage the entire Junction City operation. Petitioner was able to convince Rosewarren of this and thus secure his cooperation. In August 1974 petitioner and Mr. Merrill Werts, then the president of the First National Bank in Junction City, reviewed various alternatives for financing petitioner's purchase of C-K's stock. Mr. Werts offered to lend petitioner the necessary funds. Werts at the time was intimately familiar with the financial condition of C-K and was also familiar with petitioner's personal financial situation, with his character, and with his ability to perform. He had reason to believe that the assets of C-K would stand behind the loan. Based upon all of these factors, as well as the possibility of acquiring *531 the banking business of both companies, the Bank would have been more than willing to make such a loan. Petitioner decided, however, to obtain the cash required for the purchase from the corporation. Immediately prior to September 1974, the stock ownership of C-K was: NUMBER OF
NAME
SHARES
Gene Baird
1.00
James H. Rosewarren
Junction City, KS
54.53
Mrs. Irvin L. Cowger
Topeka, KS
31.62
E. V. Lutz
Manhattan, KS
70.87
C. L. Hoover
Junction City, KS
77.41
Robert A. Shermerhorn
Mesa, Arizona
109.03
D. D. Dreiling
Junction City, KS
183.18
Robert Fegan
Junction City, KS
31.62
Mary Lutz
Manhattan, KS
70.87
TOTAL
630.13
On or about September 30, 1974, petitioner entered into separate agreements with each of the other eight shareholders. These agreements, each five pages in length and captioned "STOCK PURCHASE AGREEMENT" were identical except for the number of shares, purchase price and name of the seller listed on page one of said documents and the signature of the seller on page six. The number of shares shown in each agreement is the same as that listed beside the seller's respective names listed above. Petitioner agreed to a purchase *532 price of $ 406.91 per share, payable as follows: NAME OF SELLER
NUMBER OF SHARES
SALE PRICE
James H. Rosewarren
Junction City, KS
54.53
$ 22,188.80
Mrs. Irvin L. Cowger
Topeka, KS
31.62
12,866.50
E. V. Lutz
Manhattan, KS
70.87
28,837.71
C. L. Hoover
Junction City, KS
77.41
31,498.90
Robert A. Shermerhorn
Mesa, Arizona
109.03
44,365.40
D. D. Dreiling
Junction City, KS
183.18
74,537.77
Robert Fegan
Junction City, KS
31.62
12,866.50
Mary Lutz
Manhattan, KS
70.87
28,837.71
TOTAL
629.13
$ 255,999.29
Petitioner was not related to any of the selling shareholders of C-K financially, by blood, or in any other manner. Pursuant to paragraph 4 of the Stock Purchase Agreement, petitioner paid the total purchase price plus interest to the selling shareholders according to the following schedule: Scheduled
Payment
Date
Principal
Interest
Total
10/15/74
$ 25,599.92
$ 25,599.92
(down payment)
11/15/74
23,039.88
757.50
23,797.38
12/15/74
23,039.88
1,363.46
24,403.34
1/15/75
30,719.93
1,195.14
31,915.07
2/15/75
30,719.93
1,009.97
31,729.90
3/15/75
30,719.93
807.98
31,527.91
4/15/75
30,719.93
605.98
31,525.91
5/15/75
30,719.93
403.99
31,123.92
6/15/75
30,719.93
30,719.93
TOTAL
$ 255,999.26
$ 6,144.02
* $ 262,143.28
*533 The agreements gave the selling shareholders the option to terminate them, in the event that petitioner defaulted in making any of the installment payments, by written notice to the First National Bank of Junction City, which was acting as escrow agent. Upon termination, all installment payments previously made by petitioner were to be forfeited as liquidated damages, the stock held by the escrow agent was to be returned to the sellers, and petitioner was to have no further rights in the stock nor any claims against the sellers. Paragraph 6 of each agreement provided that petitioner could vote the escrowed shares so long as he was not in default on the installment payments. Until the purchase price was fully paid, however, all dividends and distributions on the stock deposited with the escrow agent were to be paid over to and held by such agent. Only then were they to be distributed to petitioner, along with the purchased stock. Petitioner was obligated to maintain the net worth of the corporation during the term of the agreements at least at an amount equal to the then-unpaid balance *534 of the purchase price. Petitioner paid the purchase price with funds he received from C-K in the form of the following checks drawn on C-K's account at the First National Bank: Date of Check
Amount
11/14/74
$ 49,397.30
12/17/74
24,403.34
1/10/75
31,915.07
2/14/75
31,729.90
3/15/75
31,527.91
4/2/75
31,325.91
5/6/75
31,123.92
6/9/75
30,719.93
Adjusting Journal Entry
[1] 6,975.65
TOTAL
$ 269,188.93
The co-signers on each of the above checks were petitioner and Mr. Rosewarren. Prior to each scheduled payment date, Mr. Rosewarren, who continued *535 as C-K's general manager and as the representative of C-K's selling shareholders, would send petitioner a notice that a payment was due on such date. Petitioner's secretary would then type a document entitled "Promissory Note." The document bore the date of the scheduled payment and stated that petitioner promised to pay to C-K within one year of such date the full amount (purchase price plus interest) of the scheduled payment plus interest at the rate of 10 percent per annum. At the time these disbursements were made, C-K's accumulated earnings and profits were $ 257,537.34. Petitioner would sign the document and send it to Mr. Rosewarren, who would then prepare and sign one of the checks listed supra and send it to petitioner. Petitioner would counter-sign the check, as was required, and deposit it to his personal account. His secretary would then prepare his personal checks to each of the selling shareholders, which he would sign and mail to Mr. Rosewarren. Mr. Rosewarren would then distribute the checks to the selling shareholders. Mr. Rosewarren would not have issued the check without first receiving the "note" from petitioner. The "notes" were executed and delivered *536 to Rosewarren in order to comply with the stock purchase agreement's requirement that C-K's net worth be maintained at the unpaid balance of the purchase price. Petitioner used the entire amount of the proceeds which he received from C-K to make the installment payments required under the stock purchase agreements. Monthly operating statements were prepared for C-K by its certified public accountant, John A. Strain. The statements were used for internal management purposes and for securing credit. Copies were provided to banks and suppliers upon request. These statements listed an asset account denominated "Accounts Receivable - Stockholder" in the following amounts at the following dates: Amount in "Accounts Receivable-Stockholder"
Date
Account
4/30/75
$200,299.43
5/31/75
231,423.35
7/31/75
269,118.93
8/31/75
269,118.93
9/30/75
269,118.93
10/31/75
269,118.93
As mentioned previously, the accounting records of C-K included in the July 31, 1975, debit balance of this account $ 6,975.65 of accrued interest on the cash disbursements from C-K to petitioner, as well as the aggregate amount of such disbursements. The interest accrual was made at a 6 *537 percent rate of interest, whereas the notes executed by petitioner bore a stated interest rate of 10 percent. The discrepancy occurred because the accrual was prepared in the offices of John Strain, C-K's CPA, before copies of the notes had been sent there. The employee who performed the calculations was told to use an assumed rate of 6 percent pending determination of the true rate. A financial statement of petitioner dated April 8, 1975, and filed with various banks with which he dealt indicated a "Notes Payable" liability of $ 215,300, which represented the amounts disbursed by C-K to petitioner pursuant to the notes.The statement reported petitioner's net worth to be $ 1,012,965 and the value of his stock holdings in the liquor distributorships at $ 1,212,615, which was petitioner's rough estimate. The estimate took into account anticipated operating economies resulting from consolidation. Petitioner's gross income for the years 1972 through 1976, as reported on his Federal income tax returns filed for those years, was as follows: 1972
1973
1974
Wages
$ 15,206.00
$ 22,275.00
$ 36,333.31
Dividends
Interest
376.19
140.28
Rental Income
3,330.00
1,840.00
8,000.00
Other Income
2,132.18
1,492.21
8,479.78
Capital Gains: From liquidation of C-K
Other
14,719.50
31,601.74
15,324.31
TOTAL GROSS INCOME REPORTED
$ 35,387.68
$ 57,585.14
$ 68,277.68
*538 1975
1976
Wages
$ 66,412.96
$ 68,791.46
Dividends
134.80
327.20
Interest
110.00
1,383.29
Rental Income
24,000.00
73,107.68
Other Income
522.54
8,467.95
Capital Gains: From liquidation of C-K
64,573.15
Other
5,000.00
13,864.00
TOTAL GROSS INCOME REPORTED
$ 96,180.30
$ 230,514.73
The following table shows the net worth of the corporations directly or indirectly owned by petitioner at the indicated dates: Eastern & State
Date
(Consolidated)
Southeastern
7/31/74
12/31/74
$ (41,866)
2/28/75
$ 68,336.19
4/30/75
5/31/75
7/31/75
8/31/75
9/30/75
10/31/75
12/31/75
(92,708)
2/29/76
49,705.00
C-K
As Reported on
Excluding Loan
Returns &
to Shareholder
Date
Operating Stmts.
Account
7/31/74
$ 280,073.01
$ 280,073.01
12/31/74
2/28/75
4/30/75
292,206.80
91,907.37
5/31/75
300,860.86
69,437.51
7/31/75
296,410.85
27,291.92
8/31/75
305,014.01
35,895.08
9/30/75
306,274.47
37,155.54
10/31/75
317,160.20
48,041.27
12/31/75
2/29/76
On its July 31, 1975, fiscal year corporate income tax return, C-K reported accrued interest income of $ 6,975.65, representing *539 the interest accrual made upon C-K's disbursements to petitioner. Schedule L, line b, of this return also reported an asset entitled "Loans to stockholders" in the amount of $ 269,118.93 at year end. This amount was also reflected on C-K's July 31, 1976, return, schedule L, at the beginning of the year. No amount was shown as "Loans to stockholders" on such schedule at year end. The annual report filed by C-K with the secretary of state of Kansas for its fiscal year ending July 31, 1975, reflects loans to shareholders in the amount of $ 269,118.93. During his taxable year 1975, petitioner received a salary from C-K of $ 13,500. The net after-tax earnings of C-K for its fiscal years ended July 31, 1975 and 1976 were $ 39,667.59 and $ 39,605.50, respectively; the net after-tax earnings of State for its fiscal years ended February 28, 1975 and February 29, 1976, were $ 58,799.65 and $ 21,884, respectively. C-K paid dividends of $ 9,436.95 and $ 6,291.30 during its fiscal years ending July 31, 1974 and 1975, respectively. Petitioner's plan to consolidate the operations of State and C-K under Mr. Rosewarren's direction encountered unforeseen obstacles. The minority shareholder-salesmen *540 of Eastern disliked the idea of dismantling State, which they indirectly owned, and transferring all of its assets and personnel to C-K, in which they had no interest. State had a sizeable sales volume and profits in which they desired to participate. Also, petitioner's common ownership of State and C-K did not end the intense rivalry between their personnel. Because State had a larger warehouse than C-K, petitioner moved C-K's inventory there. State employees continued to operate the warehouse and intentionally made errors in orders which C-K's salesmen turned in. Mr. Rosewarren was very unhappy with this situation. Furthermore, the customers continued to identify strongly with the firms and salesmen with whom they were accustomed to dealing. Thus, for example, the same customer would continue to purchase part of his inventory from C-K salesmen and part from State salesmen. Petitioner had wholly failed to foresee this phenomenon and concluded that completing his original plan to consolidate operations solely under C-K's name would lead to the loss of a substantial number of State's customers, especially in view of the fact that competitors were seeking entry into the Junction *541 City market. He, therefore, decided to continue operating the two companies as separate entities. Rosewarren was unable to live with this situation, however. Petitioner had promised and convinced Rosewarren that the operations would be combined under Rosewarren's supervision. When Rosewarren realized that this scheme would not be immediately carried through, he felt betrayed and complained bitterly to petitioner. Moreover, his health was failing. He subsequently died March 1, 1976, of uremic poisoning and pneumonia. He had undergone investigative surgery for cancer. During the summer of 1975, these problems combined to create something of a crisis. Rosewarren informed petitioner that he planned to retire, and the minority shareholders of Eastern were growing increasingly restive over petitioner's plan to eliminate State. Petitioner, who had always viewed Rosewarren's services to be the most important of C-K's assets, and desiring to appease the Eastern shareholders, considered liquidating C-K. Without Rosewarren there was no reason to continue its existence, and he could domonstrate to the Eastern shareholders his intent to maintain State as a viable entity. On October 13, 1975, C-K's *542 directors and shareholders adopted a plan of complete liquidation. Under the plan, the liquidation was to be completed by July 31, 1976. However, C-K was to pay petitioner on October 14, 1975, an initial liquidating distribution of $ 269,118.93 by cancelling the notes he had executed and delivered to it in connection with the cash disbursements, as well as the interest accrued thereon. The plan was subsequently amended by moving the completion date to October 19, 1976. The liquidation transaction was not reflected on petitioner's 1975 Federal income tax return; it was reported, however, on his 1976 return as a long-term capital gain. Petitioner also claimed a deduction for interest paid to C-K of $ 18,854.46 on this return. Petitioner knew that the liquidation had to be effected before the first note came due on October 15, 1975, for $ 25,599.92 plus interest. On schedule L of its FYE July 31, 1976, Federal income tax return, C-K reported a partial liquidation distribution of $ 269,118.93 and attached to such return a copy of its Plan of Liquidation, described below. It reported no "loans to stockholders" on the schedule L as of July 31, 1976. When petitioner was considering *543 alternatives for financing his purchase of C-K's stock, he did not plan the mechanics of repayment in any detail. He realized that he would be able to liquidate excess inventory upon consolidating C-K and State, that he had a big equity interest in State, and that these assets would somehow furnish him the wherewithal to retire any purchase debt he might incur. Petitioner considered it possible that the loan financing his purchase of C-K would have been renewed upon payment of accrued interest. It is not uncommon for banks to renew loans in the $ 250,000 range. Petitioner operated C-K as a sole proprietorship for approximately two years after the conclusion of the liquidation proceedings in October 1976. The Commissioner determined that the disbursements to petitioner from C-K were not loans but were rather dividends to the extent of earnings and profits. OPINION The facts, set forth above, may be briefly summarized as follows. Petitioner, having been engaged in the wholesale liquor business in Kansas for many years, embarked upon a grand scheme of corporate acquisitions, in the course of which he became interested in purchasing C-K Distributors, Inc. (C-K). A primary *544 motivation for his interest was to acquire the services of C-K's president, Mr. Rosewarren, who was also one of its shareholders. Petitioner's plan was to combine the operations of C-K with those of State Distributors, Inc. (State), under C-K's name. State was a wholly owned subsidiary of Eastern Distributing Company (Eastern). Petitioner hoped to thereby effect certain economies of scale. Eastern's stock was owned by petitioner (82 percent) and several of Eastern's salesmen (18 percent). In September 1974, petitioner entered into stock purchase agreements with each of C-K's shareholders, under which he agreed to purchase their stock by paying monthly cash installments beginning October 15, 1974, and ending June 15, 1975. The stock was to be held in escrow by the First National Bank of Junction City until final payout, although petitioner was permitted to vote it. All distributions on the stock likewise were to be held by the escrow agent until the stock was paid for. C-K's corporate checking account was the source of each cash installment. Petitioner would execute and deliver to Mr. Rosewarren, who was the representative of the selling shareholders, one-year promissory notes *545 payable to C-K, in the amount of the purchase installment coming due. The notes bore stated interest at 10 percent. Mr. Rosewarren would then issue a C-K check to petitioner in the amount of the installment coming due. Petitioner would deposit the check to his personal account from which he would then make the required payments to the selling shareholders. These disbursements from C-K to petitioner were treated as loans to shareholders on C-K's books and records and were so reported on its Federal income tax returns, financial statements, and annual registration statements filed with the secretary of state of Kansas. C-K paid petitioner a salary of $ 13,500 during calendar year 1975, and paid dividends of $ 9,436.95 and $ 6,291.30 during its fiscal years ending July 31, 1974 and 1975, respectively. During the summer of 1975, petitioner resolved to liquidate C-K for several reasons. First, State's employees (who were in charge of the warehouse operations for both C-K and State) discriminated against C-K's salesmen in filling orders. Second, because of customer identification with the firm names and personnel of State and C-K, petitioner decided to maintain them as separate *546 entities rather than combine them under C-K's (and therefore Mr. Rosewarren's) aegis. Thus, Rosewarren became very unhappy with the situation. He had also begun to complain about his health, and was threatening to leave. Third, the salesmenstockholders of Eastern were uneasy about petitioner's plan to eliminate State, which they partially owned indirectly, and place its operations under C-K, which was completely owned by petitioner. Rosewarren's departure removed any incentive to combine operations under C-K, and by liquidating that corporation, petitioner could demonstrate his good faith to the minority shareholders of Eastern. Thus, on October 13, 1975, a plan of liquidation was adopted by C-K's shareholders and directors, to be completed by October 1976 (as later amended). The plan provided, however, that on October 14, 1975, one day before the first promissory note which petitioner executed in favor of C-K in connection with the stock purchase came due, a partial liquidating distribution was to be made to petitioner in the form of C-K's cancellation of his stock-purchase debt. The Commissioner determined, and respondent contends, that the disbursedments made to petitioner *547 were dividends to the extent of C-K's accumulated earnings and profits as of July 31, 1974, which we have found to be $ 257,537.34. Petitioner maintains that the disbursements were bona fide loans. Whether the disbursements from C-K to petitioner, detailed supra at 9, were loans or dividends to the extent of C-K's earnings and profits is a factual question to be determined upon consideration of all surrounding facts and circumstances. ; . For the disbursements to constitute loans, there must hae been, at the time of the transfers, an unconditional intention on the part of the transferee to repay them, and an unconditional intention on the part of the transferor to secure such repayment. . Our task is thus to determine whether, at the times he received the disbursements, petitioner intended to repay them and C-K intended to enforce repayment. Petitioner has the burden of proving that he received the *548 disbursements with such intent. ; . As the state of a taxpayer's mind at a given time in the past is not directly ascertainable, we must consider objective evidence. We have traditionally treated certain factors as having particular (although not exclusive) relevance in distinguishing loans from dividends, which we proceed to discuss and apply to the facts of the instant case. (1) Corroborated, Credible Testimony of Taxpayer.--The taxpayer's credible, corroborated testimony that he intended to repay the advances when made is entitled to substantial weight. . Here, of course, petitioner testified that the disbursements were actually loans. Furthermore, his testimony was corroborated by objective acts, such as the execution and delivery of promissory notes and C-K's recording of the disbursements on its books as loans. See . This factor *549 accordingly supports petitioner's contention. (2) Execution of Debt Instruments.--Taxpayer's execution and delivery to the corporation of promissory notes or other debt instruments in connection with, and in close temporal proximity to, the corporate disbursements is evidence that they are loans. ; ; . Where, however, the execution of a note and provision of security therefore occur much later than the disbursement, they are not persuasive evidence of a loan, as the intent at the time of disbursement governs. . Here, the petitioner executed and delivered promissory notes to Mr. Rosewarren for safekeeping prior to receiving the checks. This is strong evidence of debt. (3) Securing the Debt.--Taxpayer's provision of security for a *550 debt instrument also supports the characterization of a given disbursement as a loan. ; . Here, the notes to C-K were unsecured, and this factor accordingly does not favor petitioner. (4) Recording of the Disbursements on the Corporate Books and Records.--The corporation's accounting treatment of the disbursements is an important factor. When it records and carries them in its accounts as "loans receivable" or "accounts receivable," a loan is indicated, as is the case where its financial statements and income tax returns similarly reflect the disbursements. ; ; . In the instant case, C-K carried the disbursements in its records and operating statements as "Accounts Receivable--Stockholder." Petitioner's April 8, 1975, financial statement which he filed with banks indicated a liability of $ 215,300 *551 in respect of the disbursements which were also reported as "Loans to stockholders" on C-K's July 31, 1975 and 1976 fiscal year corporate income tax returns and on C-K's annual report for its fiscal year ended July 31, 1975, filed with the secretary of state of Kansas. Thus, C-K's treatment of the disbursements on its books and records was consistent with their characterization as loans. Citing , respondent maintains that in the context of a closely held corporation, self-serving bookkeeping entries must be examined with special scrutiny, and correctly points out that treatment of withdrawals on the corporate books and records and on tax returns as notes receivable is not controlling. . [1]
Nonetheless, such treatment is entitled to some evidentiary weight, which we accord it, favorably to petitioner. (5) Repayments Made.--Where the alleged corporate loans are repaid in full or in part from *552 time to time, a true loan is indicated. Failure to ever repay a mounting loan balance, however, points to constructive dividends. ; ; . In our case, there were no repayments made to C-K prior to liquidation. Respondent contends that, when integrated, the entire sequence of events is nothing more than a flagrant tax avoidance scheme. Petitioner bailed cash out of C-K in the guise of "loans," which he never intended to repay, and managed to report such emoluments as long term capital gains. Viewed in isolation, the disbursements followed rather quickly by the liquidation/debt cancellation would lend credence to respondent's position. However, petitioner's credible testimony has persuaded us that valid business reasons undergirded his decision to liquidate C-K. Petitioner was engaged in a program of acquiring liquor distributorships. Prior to purchasing C-K, he had managed to gain control of Eastern, State (his former employer), and finally Southeastern. His goal was to become a giant of the Kansas wholesale *553 liquor industry. He was attracted to C-K because of Rosewarren's successful management. C-K is thus properly seen as one of petitioner's acquisitions in the course of building a distributorship empire, and accordingly his motives with regard to it were much more permanent than respondent would have us believe. He testified at length about his plans to consolidate State's operations with C-K's, plans which were partially executed but encountered unforeseen difficulties. We are persuaded that at the time he acquired C-K through the use of the disbursements, he intended it as a permanent possession, and that subsequent events--infighting between personnel, customer firm-name identification, suspicion on the part of Eastern's minority shareholders, and Rosewarren's threatened departure--caused petitioner to consider liquidating C-K. , is apposite to the case at bar. In Benjamin, the stock-holders of a corporation received cash from it which they used to repay a bank loan financing their purchase of the corporation's stock. They executed appropriate debt instruments and the corporation recorded the disbursements *554 as loans on its books of account. Prior to repayment, however, the corporation was liquidated. The loans receivable were treated as corporate assets received by the stockholders in liquidation. We found as facts that the liquidation had not been considered until some time after the loan was made, and that its purpose was to facilitate the sale of some of the corporation's properties. We concluded as follows: It is recongnized that * * * [the Corporation] was dissolved before * * * [the stockholders] made any payment of principal or interest on account of the 1949 withdrawal. The dissolution of * * * [the Corporation] served a business purpose, namely, to facilitate separate sales of the two properties owned by that corporation.This aspect of subsequent events does not affect our conclusion. At the time the withdrawals from * * * [the Corporation] took place in 1949, there was not any plan or contemplation of dissolving and liquidating * * * [the Corporation]; and at the time the withdrawals were made, it was intended that they were loans. [.] Respondent claims that this version was implausible *555 because petitioner continued to operate C-K as a sole proprietorship for two years after liquidation. Thus, maintains respondent, C-K continued to compete with State and make money at its expense. However, petitioner's testimony makes clear that what the minority shareholders of Eastern feared was losing their indirect interest in State, a profitable concern, as a result of petitioner's plan to transfer all of State's assets to C-K. C-K had been a competitor of State for many years and there is no indication that the shareholders objected to its continuation as such. The liquidation of C-K was thus effective to assuage any apprehension that it would take over State. (6) Taxpayer-Shareholders' Ability to Repay Corporate Loan.--Whether the shareholder, at the time of the disbursement, has a realistic ability to repay it is a factor which sheds light on his intentions. ; ; . Petitioner presented *556 substantial evidence of his ability to repay the advances. His April 8, 1975, financial statement indicated a net worth of $ 1,012,965, and included in the assets category his stock in the liquor distributorships at a value of $ 1,212,615. Respondent bitterly disputes the accuracy of this figure. At trial, petitioner attempted to explain his method on direct examination, although not completely clearly. Respondent did not elicit further clarification on cross-examination. From the record, the most we can find is that petitioner valued the stock himself using some method which took into account anticipated economies resulting from consolidation. Respondent, fancifully interpreting petitioner's testimony, derives a method which he assumes petitioner was describing, applies the method to data respondent assumed that petitioner must have used, and arrives at a value for the stock of $ 190,507.28. None of respondent's interpretations or assumptions finds any support in the record. Argument on brief is no substitute for effective cross-examination which might have elicited a clearer explanation of, or defects in, petitioner's method. Petitioner arrived at his estimate of value *557 based upon his knowledge of the facts and submitted the financial statement to banks for purposes of securing and/or maintaining credit. This is at least one indicium of accuracy. Further indications of ability to pay are found in the petitioner's rather substantial gross income during the years 1972 through 1976, set out supra at page 12, and in the fact that Merrill Werts, the president of the First National Bank of Junction City, would have been willing to lend petitioner the necessary funds to acquire C-K on the assumption that the corporate assets would have secured the loan. Respondent urges, however, that we ignore these facts, citing , cert. denied . In Dolese, the taxpayer had his corporations pay his personal living expenses beginning in 1948. They treated the advances to taxpayer as loans on their books. After 1964, the taxpayer executed notes each year at 4 percent interest for the balance of the advances. When a note came due the interest was paid and a new note executed for the balance then owing. Some repayments were made, but the balances continued *558 to mount and totaled $ 1,817,133 as of March 31, 1968. Taxpayer had only $ 125,000 per year of gross income. He did not have sufficient assets outside of the three corporations he controlled to liquidate this debt. He did have sufficient borrowing power to procure a loan from a bank to do so, however. The court held that although some loan factors were present, the size of the total advancements as compared to taxpayer's income and assets not tied up in the corporation showed that the advancements were dividends. The court observed that interest alone on the $ 1,817,133 balance owed March 31, 1968, at 4 percent would be in excess of $ 72,000 per year, whereas taxpayer's gross income was only $ 125,000 per year. The court found as a fact that he was unable to liquidate the debt without sale or liquidation of one of the corporations or borrowing from a bank which loan would in turn have to be repaid by liquidating one of the corporations or receiving greatly increased dividends. Respondent reads Dolese to stand for the proposition that advances to a shareholder who intends to repay them from corporate assets are in every case dividends and argues that petitioner could not have *559 repaid the advances from C-K without liquidating one or more of his corporations or borrowing from a bank, which loan in turn would have to have been repaid by corporate liquidations or by receiving greater dividends. Thus, concludes respondent, petitioner comes within the perse rule of Dolese.
We take exception to respondent's proffered logical sequence. First, Dolese established no such perse rule. After pointing out taxpayer's inability to pay the debt without liquidating, refinancing, or increasing dividends, the court in Dolese went on to say: Had [taxpayer] borrowed this large sum in one or two lump amounts after developing a plan to sell or liquidate [one of the corporations] with the specific intent to repay from the proceeds of the disposition, a true loan situation might have existed. But the timing and pattern of the advances * * * cannot be ignored. [
The above-quoted language makes it clear that a taxpayer can plan to repay advancements from corporate assets and still be *560 treated as the recipient of a loan rather than a dividend. The court emphasized the size, timing, and pattern of the advances, not the fact that they likely would have been repaid from proceeds of liquidation or dividend. Second, the facts of our case differ quite markedly from those of Dolese. Petitioner's gross income [2] relative to the interest at 10 percent on the principal balance due C-K (approximately $ 25,000 per annum) is very obviously higher than was the case in Dolese. For example, his gross income for 1975, the first year in which any interest would have come due, was almost $ 100,000. In addition, the timing and pattern of the corporate disbursements here were much more consistent with a loan than were those in Dolese. Here, petitioner received each month, for eight months, the amount of the installment payment due to the selling shareholders. All advancements were completed within one year. *561 We further note that C-K had after-tax earnings of almost $ 40,000 for its July 31, 1975 and 1976 fiscal years; State had after-tax earnings of approximately $ 60,000 in its February 28, 1975, fiscal year and $ 20,000 in its February 29, 1976, fiscal year. Also, petitioner's plan to combine the two was designed to produce economies. Thus, their combined net incomes were another source of repayment. [3] It is, thus, not at all apparent that petitioner would have had to liquidate C-K or any other corporation in order to repay the debt. Our case is plainly distinguishable from Dolese.
The table on page 13 shows that at all times C-K itself had substantial equity. If petitioner had financed the stock purchase with a bank loan secured by the stock, there would have been sufficient equity in the corporation to repay it. Petitioner could have liquidated the corporation, received the proceeds at capital gains rates, and used them to pay off the bank. *562 We thus conclude that petitioner had the ability to repay C-K's advancements to him. (7) Control over Decision to Enforce Obligation.--This Court strictly scrutinizes transactions between a corporation and its sole shareholder. ; . The fact that the shareholder in effect has the sole authority to enforce the debt against himself certainly raises questions about the substantive significance of formal debt instruments and book entries. . In our case, however, the facts are not so adverse to petitioner. Prior to receiving any disbursements from C-K, petitioner was required to deliver promissory notes to Mr. Rosewarren, himself a selling shareholder, for sale keeping. Without receipt of the notes, Rosewarren would not have issued the checks. Rosewarren regarded himself as the representatives of the selling shareholders and as the protector of their interests. We do not believe that he would have insisted upon such formality if he and his principals had no intention of enforcing *563 the debt. The agreement provided that over its term petitioner had to maintain the net worth of the corporation at least equal to the outstanding principal balance of the purchase price, and that upon default, the selling shareholders could recover the stock and retain all of petitioner's previous payments as liquidated damages. Petitioner testified that he executed the notes in order to maintain C-K's net worth at the required amount. Respondent points out that at April 30 and May 31, 1975 (the only dates during the term of the agreement on which there is evidence in this regard), C-K's net worth, even excluding the loan account, exceeded the remaining purchase price balance. When the agreements were executed, however, neither petitioner nor the selling shareholders could foresee what the net worth would be at any given point in the future. For all they knew, petitioner could manage C-K's business poorly, default on the payments, and leave them to recover only a corporate shell. Unless they could realize on the notes, they might very well have been in far worse condition than at the time of sale, even taking into account prior payments. Further, if the notes were not regarded *564 as creating an enforceable debt, the liquidated damages provision would have been meaningless--all of the "forfeited" payments would have come from corporate assets and accordingly would have produced no benefit to the selling shareholders. Thus, over the term of the agreements, at the time the notes were executed, parties adverse to petitioner had at least a contingent power to enforce the notes.
(8) Existence of Fixed Time and Plan for Repayment.--Where repayment of the advances is to be made within a fixed time and a plan of repayment has been worked out, it is more likely that the advancements are loans. Conversely, the lack of such arrangements is more consistent with dividend treatment. . In the instant case, each of the notes which petitioner executed became due and payable one year from their respective dates. The fact that petitioner stated at trial that he "knew" the liquidation had to be effected before the first note came due shows that he regarded these time constraints seriously. Thus, there was a fixed time of repayment. Petitioner *565 testified at trial, and we have found, that he did not plan the mechanics of repayment in any detail. He did, however, have a broad and somewhat hazy "working model" of debt retirement. He knew that he would be able to liquidate excess inventory upon consolidating C-K and State, had a big equity interest in State, and that these assets would somehow furnish him the wherewithal to repay. He also considered it possible that the loan might be renewed upon payment of interest. It would not be uncommon for a bank to renew a $ 250,000 loan. The possibility of renewal is thus not inconsistent with the existence of a loan. We conclude that there was a fixed time for, and some plan--not well defined--of, effecting repayment.
(9) Correspondence between Distributions and Stock Interests.--In a multi-shareholder context, the correspondence between proportional amounts of so-called "loans" and the stock ownership interests of the "borrowers" is a strong indication of dividends. . Respondent argues that because all "loans" *566 were made to petitioner, who was also the sole shareholder, this correspondence exists here. However, it should be obvious that this factor is meaningless in the sole-shareholder situation--any corporate distribution, whether loan, dividend, or redemption, will always be made in proportion to the shareholder's interest. Hence, this factor does not apply to our analysis. (10) Existence of Earnings and Profits at the Time of Disbursements.Where the corporation has little or no earnings and profits at the time of the shareholder's withdrawals, it is not likely that he or she is using the corporation's loan account to disguise dividends. Plentiful earnings and profits at the time of withdrawals of course point the other way. ; .In our case, C-K's earnings and profits at the time the disbursements were made were $ 257,537.34, which was somewhat less than the total amount of disbursements. As there were substantial earnings and profits in comparison to the disbursements *567 made, this factor weighs against petitioner. (11) Accrual and Payment of Interest.--These acts are consistent with a loan, whereas their absence may be indicative of dividend distributions. ; . [4] In the instant case, interest was accrued on C-K's books at year-end. Respondent points out that the accrual was made at a 6 percent rate whereas the notes bore interest at 10 percent. This discrepancy was adequately explained at trial, however, as merely a failure to communicate the proper data to the independent accountant who prepared C-K's financial statements. See our Findings, supra at page 11. (12) Payment of Dividends.--A history of failure to pay dividends in the face of earnings and profits available for that purpose tends to show that "loans" are camouflaged dividends. [5] The record shows that C-K did pay dividends during its fiscal years ending July 31, 1974 and 1975 in *568 the amounts of $ 9,436.95 and $ 6,291.30, respectively. However, it appears that none of these were paid to petitioner. See supra at 12. Further, it is not clear whether or not the cash position and needs of C-K permitted any greater dividend payments. This factor accordingly is neutral in its import. (13) Shareholder-Borrower's Receipt of Salaries.--Where a sole shareholder receives no salary from a corporation it is possible that other disbursements, represented as "loans," may in reality constitute salary substitutes. Receipt of salaries denominated as such, on the other hand, supports the characterization of other disbursements as loans. . During his 1975 taxable year, petitioner received a $ 13,500 salary from C-K. This factor accordingly favors petitioner. As stated previously, these factors are not exhaustive. One circumstance, not discussed above, of particular relevance to this case is the purchase agreements' requirement that during their term *569 any dividends on the C-K stock be paid to and held by the escrow agent.If the disbursements were actually dividends, then, petitioner would have been in breach of the agreement. What is more, Rosewarren and the selling shareholders were fully aware of and participated in petitioner's mode of payment. It seems implausible that they would have stood idly by had they not intended that the disbursements were in fact loans and thus aided in the breach of a provision designed for their own protection. Based upon the foregoing analysis, we hold that the disbursements were in fact loans and not constructive dividends, and that the respondent erred in determining otherwise. Because of our holding, we need not consider petitioner's argument that petitioner's purchase of C-K's stock was in substance a redemption of the selling shareholders' stock. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
*. The parties stipulated to this sum; however, the figures actually total $ 262,343.28.↩
1. This amount was not disbursed to petitioner by check but was accrued on C-K's books as interest due from petitioner on the previous disbursements as of July 31, 1975. The disbursements and accrual were all debited on C-K's books to an account entitled "Accounts Receivable--Stockholder." Thus, the $ 269,188.93 sum, to which the parties stipulated, represents the balance of this account at July 31, 1975, rather than the actual sum of cash disbursements. We note, however, that the figures actually total $ 269,118.93, which was also the amount reflected on C-K's Federal income tax return, see below.↩
1. .↩
2. According to , cert. denied , gross income is the relevant figure for comparison, not, as respondent would invite us to believe, taxable↩ income.
3. Respondent concedes as much but claims that repayment in this mode would have required State and C-K to pay dividends to petitioner, and that petitioner never mentioned this possibility. True, but neither did he rule it out.↩
4. .↩
5. ↩