

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-10-1998

# Geftman v. Comm IRS

Precedential or Non-Precedential:

Docket 97-7313

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"Geftman v. Comm IRS" (1998). *1998 Decisions.* Paper 190.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/190

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 10, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7313

JONATHAN B. GEFTMAN,

     Appellant

v.

COMMISSIONER OF INTERNAL REVENUE

On Appeal from the United States Tax Court
(T.C. No. 91-22392)

Argued: May 18, 1998

BEFORE: SLOVITER and GREENBERG, Circuit Judges ,
and POLLAK,* Senior District Judge

(Filed: August 10, 1998)

       Steven M. Kwartin (argued)
       Raoul G. Cantero, III
       Adorno & Zeder, P.A.
       2601 South Bayshore Drive, #1600
       Miami, FL 33133

       Attorneys for Appellant

_____

*Honorable Louis H. Pollak, Senior Judge of the United States District
Court for the Eastern District of Pennsylvania, sitting by designation.

        Loretta C. Argrett
        Teresa E. McLaughlin (argued)
        Ellen Page Delsole
        Tax Division
        Department of Justice
        Post Office Box 502
        Washington, D.C. 20044

         Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

Appellant Jonathan Geftman ("Geftman") appeals from a decision of the United States Tax Court entered March 17, 1997, holding him liable for an income tax deficiency and for additions to tax due to his failure to report as taxable income a distribution he received from a trust established by his late father Raymond Geftman. The Tax Court entered its decision pursuant to its opinion filed September 30, 1996, as amended by an order of December 23, 1996. The Tax Court had jurisdiction under 26 U.S.C. #8E8E # 7442, 6213(a) and 6214 based on Geftman's timely filing of a petition contesting a Notice of Deficiency issued to him on July 3, 1991, pursuant to 26 U.S.C. S 6212. Appellate jurisdiction rests on 26 U.S.C. S 7482(a)(1). Venue is proper pursuant to 26 U.S.C. S 7482(b)(1)(A), as Geftman resided within this Circuit when he filed his petition contesting the notice of deficiency. For the reasons that follow, we will reverse the Tax Court's decision, thus vacating the tax deficiency and the additions to tax imposed on Geftman.

II. FACTUAL AND PROCEDURAL HISTORY

A. The Trusts

Raymond Geftman died on February 28, 1983, leaving a will which provided that its "primary purpose" was "to

2

provide for the benefit of " his son Jonathan Geftman, the taxpayer-appellant in this case, who was 14 years old at the time of his father's death. The will further provided that "[n]o action should be taken . . . which would unreasonably detract from [Geftman's] ability to receive the maximum income and principal to which he is entitled." The will established three trusts, designated A, B, and C, to be funded from the residuary estate with Trust A receiving 40 percent of the residuary estate and Trusts B and C each receiving 30 percent.

As specified in the will, Geftman was the sole beneficiary of Trust C and the decedent's fiancee, Edith Kermer, was the sole income beneficiary of Trust B, while the income beneficiaries of Trust A included the decedent's accountant Steven Love, his real estate agent Warren Welt, his bookkeeper Paul Creedy, and several of their relatives. The will named Love, Welt and Creedy, along with the decedent's attorneys, Terrence Russell and Jonathan Beloff, as personal representatives of the estate ("representatives"), trustees of the trusts, and directors of Berkley Mortgage Corporation ("Berkley") and BOP, Inc. ("BOP"), real estate development enterprises the estate owned.

The will authorized the trustees to make distributions to Geftman from Trust C's current income or from its principal, to the extent "necessary for his health, support, maintenance and education," including higher education and the cost of establishing him in a business or profession. Geftman then would receive the remaining principal of Trust C in installments beginning at age 30 or upon his admission to the bar, if earlier.

In contrast to these terms governing distributions to Geftman from Trust C, the will prohibited distributions from the principal of Trusts A or B, and provided that Trusts A and B were to make the specified distributions to their beneficiaries only to the extent that the trusts had current net income after expenses.1 The remainders of Trusts A and B after these trusts had made all specified

_____

1. Several beneficiaries of Trust A were to receive distributions for life while the others were to receive distributions only until age 25.

distributions were to be added to the principal of Trust C for Geftman's benefit. See app. at 127-30.

B. The Margin Transactions

In August 1983 the estate funded the trusts by transferring tax-exempt municipal bonds worth approximately $3 million to brokerage accounts held in the name of the trusts through the E.F. Hutton and PaineWebber brokerage firms. See app. at 130-32. Because the estate had not settled all of its liabilities, the personal representatives required all beneficiaries of the trusts to execute consents permitting the estate to recall all trust assets to the estate as necessary to satisfy the estate's obligations, even if the recall completely depleted the trusts.[2]

In December 1983 the estate entered into a Settlement Agreement resolving lawsuits pending against it. During the same month, the trusts began brokerage borrowing on margin at rates of 11.50% to 13.25% using their municipal bond assets as collateral and transferring the funds borrowed to the estate. See app. at 178-92; 131. The trusts borrowed $74,950.97 in December 1983, see app. at 154, $870,000 on January 5, 1984, see app. at 192, and $300,000 on January 9, 1984, see app. at 152, for a total of $1,244,950.97 by January 9. On January 17, 1984, the representatives met and issued the following memorandum of their meeting:

> The Settlement Agreement . . . was ratified. . . .
>
> The actions necessary to pay or transfer estate assets needed for the settlement was also ratified, however, there was lengthy discussion on the issue as to the ratification of the borrowing from the stockbroker by using trust assets as collateral as opposed to the sale of estate assets to pay the sums due for the settlement. The action which had been taken to borrow was ratified, however it was acknowledged that Paul Creedy had dissented from the decision to borrow for purposes

_____

2. Because Geftman was a minor, his mother executed his consent in her capacity as his legal guardian.

> of carrying out the settlement agreement, however Paul
> Creedy agreed to the ratification of the action.

App. at 135a. The estate received additional transfers from the trusts during 1984 for a total of $2,850,408 as of August 31, 1984, which represented the maximum amount that could be borrowed on margin against the trusts' $3 million municipal bond collateral. See app. at 131.

The trusts' E.F. Hutton account statements reflected the monthly interest which the broker charged on the margin loans. On the statements for the months of April through July 1984, handwritten notations indicated that a portion of the margin interest charges was attributable to the amounts forwarded to the estate while a portion was attributable to funds which the trusts lent to Edith Kermer. See app. at 160-99. The loan to Edith Kermer was secured by a first mortgage in favor of the trusts and was repayable pursuant to the terms of an installment note which provided for monthly payments of principal plus interest at a rate of 1% above the rate charged to the trusts by E.F. Hutton. See app. at 416.

On four occasions the estate paid the trusts an amount equal to the notation on the prior month's statement indicating the amount of margin interest attributable to the estate. During the period from April through August 1984, the handwritten notations and corresponding payments were as follows:

| Statement Date | Notation of Estate's Share of Interest | Deposit Into Account |
| --- | --- | --- |
| 4/84 | $16,086 | -- |
| 5/84 | $20,538 | $16,086 |
| 6/84 | $21,580 | $20,538 |
| 7/84 | $24,560 | $21,580 |
| 8/84 | -- | $24,560 |
| total | $82,764 | $82,764 |

See Geftman v. Commissioner, 72 T.C.M. (CCH) 816, 818 (1996); app. at 179, 181, 183, 185, 187.

C. The Mortgage Transactions

The representatives, including those who served as officers and directors of Berkley and BOP, met on

September 5, 1984, regarding Berkley's and BOP's condominium development ventures, including ventures known as "La Playa" and "Blue Grass." The representatives determined that because a financing arrangement for the La Playa condominium development had fallen through, it was necessary for the trusts to sell their municipal bonds and transfer the proceeds to Berkley and BOP. The bonds were sold for a capital loss of approximately $100,000 and the proceeds were used to satisfy the margin debt owed to E.F. Hutton. According to the memorandum of the September 5 meeting, the remaining proceeds from the sale of the bonds were transferred to La Playa "as a down payment for the purchase of all new first mortgages . . . on the La Playa units." App. at 135a–b.

A memorandum dated February 4, 1985, indicated that the trusts had acquired the La Playa mortgages, although Berkley would hold the title to them. The memorandum stated that,

> the prior action[s] taken with regard to Trust A, B and C . . . were confirmed . . . . Approximately $2,000,000 in first mortgages at LaPlaya have been bought outright by the Trust . . . . Title to the mortgages[was] taken in the name of Berkley Mortgage Corp. as collection agent for the Trust . . . . The balance of Trust assets for approximately $1,000,000 has been used to buy mortgages from BOP, Inc. which were also taken in Berkley's name as collection agent.

App. at 135c. The trusts' books did not reflect a purchase of the mortgages corresponding to the transaction described in the February 4, 1985 memorandum. However, "adjusting journal entries" recorded on June 11, 1985, after the trusts' tax year ended on February 28, 1985, indicated that the trusts had received $2,029,390 in La Playa condominium mortgages from the estate as a "partial debt settlement." Supp. app. at 40.3

A document entitled "Berkley Mortgage Corp. Accrued Interest and Principal Collections" set forth cumulative

_____

3. The estate's tax year ended March 31 while the trusts' ended February 28.

6

totals of the principal and interest which Berkley received on the La Playa and Blue Grass mortgages for the tax year ended February 28, 1985, and for the "Ten Months Ended 12/31/85." The document indicated that Berkley had collected $90,595.81 in payments on mortgages at the La Playa and Blue Grass developments, and attributed these amounts to the trusts. See supp. app. at 39. One of the representatives testified that the document was prepared no earlier than December 31, 1985, ten months after the end of the tax year. See supp. app. at 33.

Berkley intermittently transferred funds to the trusts as follows:

| | |
|---|---|
| Oct. 17, 1984 | $12,000 |
| Nov. 9, 1984 | $ 5,000 |
| Jan. 4, 1985 | $25,000 |
| Jan. 29, 1985 | $ 1,000 |
| Feb. 5, 1985 | $14,000 |
| Feb. 14, 1985 | $ 1,000 |
| Feb. 20, 1985 | $ 1,000 |
| Total | $59,000.4 |

The trusts recorded their receipt of these transfers under an account entitled "Berkley Mtg. Co." App. at 384–85.

On June 16, 1985, Berkley assigned the La Playa and Blue Grass mortgages to Ohio Savings Bank to secure a $1.8 million loan to Berkley and BOP. Berkley represented that it was the "sole and lawful owner" of the mortgages "free and clear of any and all claims and liens," and that it possessed "the full right and lawful authority to deliver, pledge, assign, grant, convey and transfer" the mortgages as security for the loan. App. at 390.

On July 30, 1986, Ohio Savings Bank reassigned the mortgages to Berkley, and on August 15, 1986, Berkley sold the mortgages to Horowitz Finance Corporation and

_____

4. In the computerized general ledger the first two payments of $12,000 and $5,000, which were recorded separately in the handwritten journal, were consolidated into one $17,000 payment. An additional $10,000 payment was recorded and then reversed, as it occurred after the end of the fiscal year. See app. at 382–88.

7

Fleet National Bank. The closing documents identify Berkley and BOP as the sellers and Horowitz and Fleet as the purchasers. Berkley and BOP used the proceeds of the sale to satisfy the prior loan from Ohio Savings Bank. See app. at 398-407; 73. In December 1987 the estate formally exercised its right to recall the assets it had conveyed to the trusts, and eventually recalled all trust assets due to the estate's poor cash position. See app. at 135g-i.

D. Distributions and Tax Returns

The estate reported no distributable net income ("DNI") for fiscal years 1984 and 1985.5 For tax year 1984 the estate reported negative taxable income of $860,171 and incurred actual losses of $369,517. For tax year 1985 the estate reported negative taxable income of $379,955 and incurred actual losses of $327,946.

The trustees, who were also representatives of the estate, did not file any Form 1041 Fiduciary Income Tax Returns and did not report any interest income for the tax year ended February 28, 1984. For the tax year ended February 28, 1985, the trustees filed a Form 1041 for each of the trusts, but filed them in February 1986, nine months after they were due. The Form 1041 for Trust C reported that Trust C had received $101,890 in DNI during fiscal year 1985, consisting of Trust C's 30% share of the trusts' tax-exempt municipal bond interest and its 30% share of the transfers made to the trusts in connection with the E.F. Hutton margin advances and the La Playa and Blue Grass mortgage holdings. Although the Form 1041 indicated that the entire $101,890 had been distributed to Geftman, only $46,936 actually was distributed while the rest remained in an E.F. Hutton account to which neither Geftman nor his legal guardian had access. See app. at 135, 216-20.6

_____

5. The Distributable Net Income of an estate or a trust determines the amount that a beneficiary receiving a distribution from the estate or trust must include in the beneficiary's gross income. See 26 U.S.C. S 662(a). DNI generally consists of the taxable income of the estate or trust, subject to certain modifications. See 26 U.S.C. S 643(a).

6. The Schedules K-1 attached to the Form 1041 for Trust A indicated that Love, Welt, and Creedy each received trust distributions of $13,136. See app. at 206-08.

Geftman, who received only $2,620 in income apart from the trust distribution, see app. at 126, did not file an income tax return for 1985. On July 3, 1991, the Commissioner of Internal Revenue ("Commissioner") issued Geftman a Notice of Deficiency finding him liable for an income tax deficiency of $13,043 on the grounds that $48,693 of the $101,890 distribution reported on the Form 1041 was taxable. The Commissioner also imposed additions to tax due to Geftman's failure to file a return or pay estimated tax on the distributions. See app. at 137-39.

Geftman filed a timely petition in the United States Tax Court contesting the asserted deficiency and additions to tax. He contended that his entire distribution from Trust C, which the Commissioner now stipulates totaled $46,936 rather than $101,890, was non-taxable pursuant to 26 U.S.C. S 662(b) and Treas. Reg. S 1.662(b)-1 because, contrary to the trustees' representations on the Form 1041, all of the income to Trust C was non-taxable. According to Geftman, the trustees had mischaracterized the transfers from the estate as taxable interest income paid to the trusts in their capacity as creditors in the margin loan transactions and as holders of the La Playa and Blue Grass mortgages when in reality those transfers constituted non-taxable distributions to the trusts as beneficiaries of an estate which did not have any distributable net income. See 26 U.S.C. S 662(a).

E. The Tax Court Opinion

Following a three-day trial held in December 1995, the Tax Court issued a Memorandum Opinion dated September 30, 1996, rejecting Geftman's contentions and finding that the transfers from the estate constituted taxable income to the trusts. Geftman v. Commissioner, 72 T.C.M. (CCH) 816 (1996). The court found that the $82,764 transferred to the trusts in connection with the E.F. Hutton margin borrowing constituted taxable interest income arising from a bona fide debtor-creditor relationship between the estate and the trusts. Id. at 821. The court also found that the $90,596 in mortgage payments which Berkley collected on the La Playa and Blue Grass mortgages constituted interest income to the trusts because the trusts "clearly owned" the La Playa

9

and Blue Grass mortgages. Id. at 821–22. Thus, the court concluded, because a portion of the income to the trusts was taxable, a like proportion of the trusts' distribution to Geftman was taxable. See 26 U.S.C. S 662(b); Treas. Reg. S 1.662(b)–1.

Geftman filed a timely motion for reconsideration pursuant to Rule 161 of the Rules of Practice and Procedure of the Tax Court, pointing out that Berkley had transferred to the trusts only $59,000 of the $90,596 in mortgage income it had attributed to the trusts. In an order dated December 23, 1996, the Tax Court granted the motion, recognizing that the trusts had received only $59,000 of the $90,596 which the court had characterized as mortgage interest income in its September 30, 1996 opinion.

Based on this corrected amount, the Tax Court found that Trust C had earned $118,251 in distributable net income and that 36% of this amount, consisting of Trust C's 30% share of the $82,764 margin loan interest and of the $59,000 mortgage interest, was taxable while the remainder was non–taxable interest on the municipal bonds.7 Applying the character rule, which provides that a distribution from a trust is taxable in the same proportion that the trust's income is taxable, see 26 U.S.C. S 662(b); Treas. Reg. S 1.662(b)–1, the court found that 36% of Geftman's $46,936 distribution was taxable and issued a final order assessing an income tax deficiency of $2,638.00 and imposing additions to tax totaling $810.50 for Geftman's failure to file a timely return and pay estimated

_____

7. The court computed these amounts as follows, based on Trust C's 30% share of the trusts' net assets:

|  |  |
|---|---|
| 30% x $82,764 taxable margin transaction income | = $24,829 |
| +30% x $59,000 taxable mortgage transaction income | = $17,700 |
| total taxable income | $42,529 |
| total taxable income | = $42,529 |
| +30% x $252,406 tax-exempt municipal bond income | = $75,722 |
| net income to Trust C | = $118,251 |
| $42,529 taxable income ÷ $118,251 net income | = 36% |

See app. at 436–37.

tax as required under 26 U.S.C. SS 6651 and 6654. See app. at 436–38.8

Geftman timely filed this appeal. We review the Tax Court's factual findings for clear error, but exercise plenary review of its conclusions of law. Fredericks v. Commissioner, 126 F.3d 433, 436 (3d Cir. 1997).9 The taxpayer bears the burden of proving the error in the deficiency assessed against him. See Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9 (1933); Cebollero v. Commissioner, 967 F.2d 986, 990 (4th Cir. 1992).10

_____

8. Thirty-six percent of Geftman's $46,936 distribution equals $16,897. The Tax Court calculated Geftman's tax liability on $16,428 but did not explain the $469 discrepancy. See app. at 436–37. However, the court's calculation of Geftman's ultimate tax liability is not germane to our analysis.

9. While the determinations as to whether the transaction gave rise to a bona fide debt and whether the trusts owned the mortgages could be considered to be findings of "ultimate fact," we have held that "we no longer recognize the ultimate fact exception to the standard that factual findings are reviewed only for clear error." Pleasant Summit Land Corp. v. Commissioner, 863 F.2d 263, 268 (3d Cir. 1988) (citing American Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 370 n.2 (3d Cir. 1987)).

10. Geftman contends, br. at 17, that the burden of proof should have been shifted to the Commissioner because Geftman demonstrated that the Commissioner's determination of a deficiency arbitrarily and erroneously rested on a Form 1041 which inaccurately reported that Trust C had distributed $101,890 instead of $46,936 to him. See Cebollero v. Commissioner, 967 F.2d at 990; Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991); Anastasato v. Commissioner, 794 F.2d 884, 887 (3d Cir. 1986). However, where the burden is shifted to the Commissioner, the Commissioner only need satisfy a burden of going forward by presenting some evidence of the taxpayer's liability; the "ultimate burden of proof or persuasion remains with the Taxpayer." Anastasato, 794 F.2d at 887. Because the record contains sufficient evidence to satisfy the Commissioner's burden of going forward, but more importantly clearly satisfies Geftman's ultimate burden of proving that the deficiency was assessed in error, we need not address Geftman's argument that the Tax Court improperly allocated him the burden of proof.

11

III. DISCUSSION

A. Margin Interest Transactions

The Tax Court's conclusion that a portion of Geftman's distribution from Trust C was taxable rested in significant part on its finding that the $82,764 which the estate paid to the trusts in connection with the margin advances constituted taxable interest income which the trusts received in their "capacity as creditor rather than beneficiary of the estate." Geftman, 72 T.C.M. (CCH) at 821. This finding, in turn, rested on the court's determination that the $2.85 million which the trusts transferred to the estate gave rise to a bona fide debt owed by the estate to the trusts. See id.

For "disbursements to constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment." Haag v. Commissioner, 88 T.C. 604, 615–16 (1987), aff 'd, 855 F.2d 855 (8th Cir. 1988) (table); accord Saigh v. Commissioner, 36 T.C. 395, 419 (1961). In the absence of direct evidence of intent, the nature of the transaction may be inferred from its objective characteristics, see Haag, 88 T.C. at 616, including the presence or absence of debt instruments, collateral, interest provisions, repayment schedules or deadlines, book entries recording loan balances or interest payments, actual repayments, and any other attributes indicative of an enforceable obligation to repay the sums advanced. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 696 (3d Cir. 1968).

Where, as here, the transactions occur between related entities rather than at arms' length, they are "subject to particular scrutiny because the control element suggests the opportunity to contrive a fictional debt." In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976) (citations and internal quotations omitted). Thus, a transaction must be measured against "an objective test of economic reality" and characterized as a bona fide loan only if its"intrinsic economic nature" is that of a genuine indebtedness. Fin

12

Hay, 398 F.2d at 697. In light of these principles, we must consider whether the evidence as to the contemporaneous intent at the time of the transfers and the objective attributes and economic realities of the transaction between the trusts and the estate support the Tax Court's conclusion that the transactions gave rise to a bonafide debt.

1. Contemporaneous Intent

The Tax Court acknowledged that a transfer will be characterized as a bona fide loan if " `at the time the funds were transferred, [there was] an unconditional intention on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment.' " Geftman, 72 T.C.M. (CCH) at 820 (quoting Haag, 88 T.C. at 616). The court found that the January 17, 1984 memorandum memorializing the lawsuit Settlement Agreement which referred to "borrowing from the stockbroker" by "using the trusts assets as collateral" constituted evidence of the requisite intent. Id . at 821. We disagree.11

The "determinative fact is the intention as it existed at the time of the transaction." Saigh, 36 T.C. at 420. While the Tax Court stated that the January 17 memorandum was "followed by" a transfer of funds from the trusts to the estate, Geftman, 72 T.C.M. (CCH) at 821, it did not acknowledge that by the time of the January 17 meeting, the trusts already had borrowed almost $1.25 million in brokerage loans and had transferred funds to the estate with no statements from either entity as to the intended nature of those transfers. The Commissioner asserts, br. at 25, that the January 17 meeting merely "ratified" an intention existing at the time of the initial transfers. However, the memorandum of that meeting indicates that the issue of whether to borrow was the subject of"lengthy discussion" and "dissent" among the estate's representatives. Although the memorandum states that the

_____

11. The parties stipulated that this memorandum constitutes the "only written evidence of indebtedness reflecting any debt due from the Estate to the Trusts." App. at 134.

13

representatives were able to agree by the end of that meeting, the ongoing dissent as of January 17 reveals that the representatives had not formed the requisite unconditional intention to enter into a debt transaction as of December 1983 when the transfers began.

Courts have refused to credit statements of intent made after the time of the transfer even where the statements consist of formal resolutions establishing the precise terms of a debt. See Georgiou v. Commissioner, 70 T.C.M. (CCH) 1341, 1350-51 (1995). In Saigh, 36 T.C. 395, the court rejected the assertion that there was a debt because funds had been transferred between a subsidiary and a parent corporation and, as in this case, "at that time nothing was said concerning the nature of the transfer." Id. at 419. Although the transferor's directors then authorized a loan consisting in part of the sums already transferred and the transferee then executed a secured note payable to the transferor on demand at a specified interest rate, the court found this evidence of intent insufficient as it was not contemporaneous with the initial transfer. As the court explained, the parties had been undecided as to the nature of the transaction at its inception, and this indecision "affirmatively dismisses the possibility that on the date of transfer there was an unconditional intention on the part of the transferee . . . and . . . the transferor to secure repayment." Id. Similarly, in this case neither the trusts nor the estate expressed the requisite intent to enter into a loan transaction at the time of the initial transfer, and the evidence that the estate's representatives remained undecided during the following month precludes us from finding that they had formed an unconditional intention as the transfers commenced in December 1983.12

_____

12. The Commissioner asserts that one of the representatives testified that "a loan . . . was intended from the outset." Br. at 29 (citing app. at 15, supp. app. at 3-5, 10). The record does not support this assertion. The cited testimony simply describes the transactions in retrospect as "loans" and "borrowing" without clarifying whether the intent to borrow existed at the time the transfers were made. Wefind nothing in the record suggesting that the intent to create an enforceable debt existed as of December 1983.

The Commissioner contends, br. at 28-29, that this case is distinguishable from Saigh because any indecision at the January 17 meeting arose from uncertainty over whether to proceed with a loan "as opposed to the sale of estate assets," and therefore involved a debate between two distinct transactions, whereas in Saigh the parties were considering two different characterizations of the same transaction. Thus, the Commissioner argues, in contrast to Saigh where the parties could have remained undecided while making the transfer, in this case the very fact of the transfer reveals that the estate had opted to borrow instead of selling estate assets. We find this distinction unpersuasive.

The mere fact that a transfer occurred does not establish whether that transfer was intended as a bona fide loan with the requisite unconditional intention to repay. See Haag, 84 T.C. at 616. While the transaction clearly did not entail a sale of estate assets, the fact that it involved a transfer is not sufficient to establish that the transfer may be characterized as a bona fide loan for tax purposes. In the absence of any evidence that the transfer was intended at its inception to create an unconditional obligation to repay the sums transferred, we cannot infer that, simply because there was a transfer, a bona fide indebtedness was created.

Even if the intentions expressed in the January 17 memorandum could be viewed as reasonably contemporaneous with the initial transfer, those intentions are not sufficient to support a finding of an intent to create a bona fide debtor-creditor relationship between the estate and the trusts. The memorandum's only allusion to borrowing refers to "borrowing from the stockbroker by using trust assets as collateral." App. at 135a. This statement reflects only the undisputed fact that significant sums were borrowed from the stockbroker, E.F. Hutton, and then advanced from the trusts to the estate. It does not illuminate whether the trusts, in transferring the borrowed sums to the estate, intended those transfers to be bona fide loans subject to an unconditional obligation to repay or whether the estate intended to be bound by an unconditional obligation to repay the advances. The January 17 memorandum, therefore, cannot be construed

15

as evidence of a contemporaneous, unconditional intent to create a bona fide debt owed by the estate to the trusts. Because this document constitutes the only evidence in the record purporting to express the intent behind the transactions, and because this document indicates that the requisite intent had not been formed at the relevant time, the record cannot support the Tax Court's finding that the estate and the trusts intended at the time of the initial transfer to create an unconditional debt.

## 2. Objective Indicia of Indebtedness

The necessary intent to create a bona fide indebtedness can be inferred not only from expressions of the parties' intentions, but also from objective aspects of the transaction such as the presence vel non of notes or other debt instruments, security or collateral, interest charges, repayment schedules or deadlines, book entries recording loan balances or payments, actual repayments, or any other factors indicative of an unconditional obligation to repay. See Fin Hay, 398 F.2d at 696; Haag, 88 T.C. at 616. The Tax Court acknowledged that in transferring $2.85 million to the estate, the trusts did not obtain a debt instrument or other written promise to repay, did not require any collateral or security, did not impose any interest charges, did not establish a repayment schedule or maturity date, and did not make any entries on their books treating the transfers as loans. See Geftman, 72 T.C.M. (CCH) at 820–21. In concluding that the transfers nonetheless constituted bona fide loans, the court relied primarily on the fact that the estate had made $82,764 in repayments to the trusts. See id. at 821. 13 However, upon analyzing the significance of these repayments and of the

_____

13. The court also characterized as "objective evidence of indebtedness" the January 17, 1984 memorandum and a June 11, 1985 "adjusting journal entry" referring to a "partial debt settlement" with the trusts. Geftman, 72 T.C.M. (CCH) at 821. However, such "allegedly objective . . . indicia" which merely represent a party's characterization of the transaction are unpersuasive "unless supported by objective factors demonstrating economic reality." Gilbert v. Commissioner, 74 T.C. 60, 65 (1980). Accordingly, we confine our analysis to the objective characteristics of the transfer which bear on its actual terms.

16

other objective attributes of the transaction, wefind that its objective characteristics preclude us from upholding the Tax Court's conclusion that it gave rise to a bonafide debt.

a. Repayments

The Tax Court found that the estate's repayments to the trusts of $82,764 were indicative of a bona fide debt. While the court described the repayments as interest "paid to the trusts . . . on loans from the trusts to the estate," it recognized that the payments constituted "a portion of the margin interest charged on the trusts' loan from E.F. Hutton," as each of the four repayments corresponded to handwritten notations on the prior month's E.F. Hutton statement calculating the portion of the E.F. Hutton interest charges attributable to the sums advanced to the estate. Geftman, 72 T.C.M. (CCH) at 821. The fact that the estate merely reimbursed the trusts for a portion of interest charges that the trusts incurred from a third party belies the court's conclusion that the trusts received these payments in the capacity of a bona fide creditor. See id.14

Even if the trusts had not owed the $82,764 to the third-party lender that provided the capital in this transaction, but rather had received that sum from the estate and retained it as repayment of principal or as payment of interest charged by the trusts themselves, repayment in

_____

14. The Commissioner asserts, br. at 34, that the estate was to pay the trusts enough to allow the trusts to make a profit after paying the interest charged by E.F. Hutton. The Commissioner concedes that no documents reflect such an arrangement, and relies solely on testimony in which one of the representatives initially made the same assertion, but then, when questioned about the lack of records to that effect, acknowledged, "I have to be honest with you. . . . My recollection is it was done at a profit [for the trusts]," but if the records do not so reflect,
then the trusts were to receive "no less than dollar for dollar" on the amounts they were charged by E.F. Hutton. App. at 19. This testimony does not support a finding that the trusts were to earn a profit on the transactions. While the Tax Court found that the trusts could not have made their monthly payments to E.F. Hutton unless they had received the payments from the estate, see Geftman, 72 T.C.M. (CCH) at 821, this fact does not elucidate whether the payments properly may be characterized as interest paid on a bona fide debt.

17

that amount would be insufficient to support afinding of a bona fide obligation to repay the $2.85 million transferred to the estate, since repayments which are insubstantial in relation to the amount transferred are not indicative of a bona fide debt. In In re Uneco, 532 F.2d 1204, the transferee repaid $40,000 on a transfer of $193,090; $26,869 on a transfer of $227,571; and $120,728 on a transfer of $207,667, representing repayments of approximately 21%, 12%, and 58%, respectively, for an aggregate repayment of approximately 30% of the total amount advanced. The court found these payments insufficient to establish that the transferee had an unconditional obligation to repay the principal amount transferred. See id. at 1204. Thus, a fortiori, the repayments in this case of $82,764 on a transfer of $2.85 million, representing a repayment of only 3% of the total amount transferred, cannot be regarded as evidence of a bona fide obligation to repay the principal amount transferred.

In Gilbert v. Commissioner, 74 T.C. 60, 65–66 (1980), the court held that even complete repayment of the amount transferred was not indicative of a bona fide debt since the repayment occurred after a long period without repayments, and thus did not correspond to repayment terms or schedules established at the outset of the transaction. The pattern of repayments in this case similarly does not reveal any established repayment terms or schedules, as the estate made the repayments only on four occasions from May through August 1984, making no other repayments during the period in which it received transfers from the trusts.

In Georgiou, 70 T.C.M. (CCH) at 1351, the court found that repayments were not probative of a bona fide debt as they not only were "insubstantial in relation to the advances" but also resulted in "[f]ailure to repay an ever mounting loan balance." In this case the insubstantial repayments representing only 3% of the amount transferred similarly failed to reduce an ever-mounting loan balance resulting from the fact that the estate received additional transfers of $746,902 during the months in which it made the repayments of $82,764. See app. at 184, 178.15 For

_____

15. The parties stipulated that "[t]he total borrowing on margin as of August 31, 1984 was $2,850,408.34" and that "[a]ll funds that were

these reasons, the repayments of $82,764 cannot be regarded as evidence of a bona fide debt, in contrast to repayments that are "regularly made" and result in "an annual net reduction in the balance" by discharging "all stated interest charges" and a portion of the principal. See, e.g., Litton Bus. Sys., Inc. v. Commissioner , 61 T.C. 367, 380 (1973).16 Thus, we find that the Tax Court erred in characterizing the $82,764 repayments as evidence of a bona fide debt.

b. Other Objective Factors

The other objective characteristics of the transaction are equally inconsistent with the existence of a bonafide debt. While the Tax Court noted that the transfers were not accompanied by any notes, interest charges, collateral, repayment schedules, or book entries recording a loan balance, the court found the absence of these factors

_____

borrowed on margin from E.F. Hutton . . . were transferred to the Estate from the Trusts." App. at 131. The E.F. Hutton Statements reflect a margin loan balance that increased from $2,103,506 as of May 1984 to $2,850,408 as of August 1984, see app. at 184, 178, for a total increase of $746,902 during that period. Several courts have refused to characterize a transfer as a bona fide loan where, as here, the transferor did not establish a maximum loan amount but continued transferring funds at the transferee's request. See Haag, 88 T.C. 617; Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1328–29 (1971), aff 'd, 496 F.2d 876 (5th Cir. 1974) (table); Roschuni v. Commissioner, 29 T.C. 1193, 1202–04 (1958), aff 'd, 271 F.2d 267 (5th Cir. 1959).

16. The Tax Court found that the trusts received additional repayments when the estate transferred mortgages to the trusts as a "partial debt settlement." See Geftman, 72 T.C.M. (CCH) at 821. However, as discussed more fully below, the trusts never received any beneficial interest in the mortgages. Even assuming that the trusts had acquired some interest in the mortgages, the June 11, 1985 document making adjusting journal entries and characterizing the purported mortgage transfer as a partial debt settlement was contradicted by contemporaneous documents describing that purported transfer as a purchase. See app. at 135c. Thus we find no evidence to support the assertion that the trusts received additional repayments in the form of a mortgage transfer, and accordingly confine our analysis of the repayments to the $82,764 which the trusts actually received.

19

insignificant on the grounds that such features were not necessary in transactions between related parties. See Geftman, 72 T.C.M. (CCH) at 820–21. To the contrary, however, cases examining transactions between related parties have found the absence of such factors highly significant and have characterized transfers as bona fide loans only where the record contains sufficient objective evidence of an enforceable obligation to repay and a reasonable expectation of repayment.

In Baird v. Commissioner, 43 T.C.M. (CCH) 1173, 1180–81 (1982), the court recognized a bona fide debt between related parties because the transferee had executed promissory notes establishing a payment schedule and charging interest at a rate of ten percent, and had delivered the notes to the transferor "prior to . . . receiving the checks," while the transferor had recorded the "disbursements on its books as loans." Similarly, in American Processing & Sales Co. v. United States, 371 F.2d 842 (Ct. Cl. 1967), the court found sufficient evidence of an "enforceable obligation to repay" and a "reasonable expectation of repayment" in a transaction between related corporations, inasmuch as the transferor held a lien on the transferee's buildings and fixtures and both corporations recorded consistent, definite amounts due on the debt. See id. at 845–46, 856–57.

Likewise, in Litton Bus. Sys., 61 T.C. 367, the transferee corporation adopted a resolution prior to the transfer authorizing the corporation "to borrow" from its parent corporation, and at the time of the transfer both the transferor and transferee recorded the same "opening balance" of the amount owed by the subsidiary. Moreover, the "indebtedness and its essential terms" were recorded on the books of both companies and in "a substantial amount of correspondence" which set forth "the existence of a debt obligation, the amount thereof and payments thereon,[and] the provision for interest." Furthermore, the interest rate was "reasonable[ ] in light of the prevailing interest rates in the financial community at that time," the"due date [was] within the control of the creditors," and there was a "reasonable expectation, at the inception of the [transaction], of repayment . . . based on the[transferee's] established financial history." See id. at 376–80.

20

The Tax Court cited cases such as Baird, American Processing, and Litton for the proposition that the absence of certain formalities may be excused when the transferor and transferee are related entities. See Geftman , 72 T.C.M. (CCH) at 820-21. The court failed to acknowledge, however, that although the courts in those cases did not require the presence of every possible indicium of indebtedness, they did not recognize a debt in the absence of all objective indicia, but rather based their recognition of a debt on numerous objective factors not present in this case. 17

While the foregoing cases demonstrate that the courts have required objective indicia of an obligation to support assertions of indebtedness between related parties, perhaps more significantly, numerous cases, including those relied upon by the Tax Court, have rejected assertions of indebtedness between related parties despite the presence of significant objective evidence that the transfer was intended as a loan. For instance, in Donisi v. Commissioner, 26 T.C.M. (CCH) 327 (1967), aff 'd, 405 F.2d 481 (6th Cir. 1968), the court rejected the assertion that a shareholder's transfers to his closely held corporation were bonafide loans, although the transferee, prior to the transfers, had adopted a formal resolution authorizing it to borrow from the transferor at specified interest rates, had computed and recorded the interest owed on its books, and had made several payments designated explicitly as interest owed on the loans. The court found these factors insufficient, inasmuch as the transferor did not require any "notes or other written evidence of indebtedness," and did not establish a repayment schedule or obtain any collateral although the transferee had assets "of a kind which

_____

17. Apart from Baird, American Processing, and Litton, the Tax Court cited only one case that characterized a transfer between related parties as a bona fide debt. That case also relied on objective factors not present
in this case, such as a duly executed promissory note and consistent treatment of the transfer on the parties' books andfinancial statements as "loan receivables." See Shaken v. Commissioner, 21 T.C. 785, 793 (1954). However, the Shaken court's conclusion that the transfers were loan repayments also rested in large part on an analysis of factors which undermined the Commissioner's assertion in that case that the transfers constituted dividends, an analysis that is inapposite in this case.

normally are considered excellent security." Id. at 330. Thus, in Donisi, although the parties had manifested an intent to create a loan through objective factors such as contemporaneously stated interest rates and book entries consistent therewith, the court found it significant that the transferor, like the trusts in this case, did not take readily available measures, such as obtaining notes or collateral, to ensure repayment.

In Georgiou, 70 T.C.M. (CCH) 1341, the court found that transfers from a corporation to its shareholder were not bona fide loans, although the corporation had obtained a security interest in the shareholder's assets, established a fixed maturity date, charged the shareholder interest, treated the transfers as loans on its books, and received funds back from the shareholder which the corporation explicitly designated as loan repayments. Despite these objective indicia of indebtedness, the court found that the transfers did not give rise to a bona fide debt, since there was no indication that the shareholder intended to "enforce the debt against himself." Id. at 1351. Thus, contrary to the Tax Court's finding that the relatedness of the parties obviated the need for objective evidence of indebtedness, Georgiou demonstrates that even extensive objective evidence may be insufficient to establish the existence of a debt where the close relationship between the transferor and the transferee leaves the transferor discretion as to whether to enforce the debt, rendering any obligation to repay conditional rather than unconditional.

Likewise, in Gilbert, 74 T.C. 60, the court rejected the assertion that a transfer constituted a bona fide loan although "the transfer was consistently treated as a loan on the books . . . and balance sheets of both corporations," "the check . . . included a notation that it was a loan," and the transfer subsequently was repaid in full. Id. at 65. The court found that the characterization of the transfer as a loan on these documents was unpersuasive, since the transferor did not charge interest, obtain a note, require collateral, impose a repayment schedule, or take other measures to ensure repayment. Moreover, the transferor had "borrowed the same money at interest" and had "no business purpose . . . to have subsidized" the transferee by

22

" `loaning' the same funds without requiring the payment of at least an equivalent rate of interest." Id. at 66. Finally, the transferee's financial difficulties, which raised doubts as to whether the transferee "would have funds available to repay," demonstrated that the transfer was economically unreasonable as a loan transaction and precluded the court from recognizing a bona fide indebtedness. Id. Virtually all of the factors that weighed against recognition of a debt in Gilbert are present in this case where the trusts borrowed funds at interest, transferred them to the estate without charging an equal rate of interest and obtaining notes, collateral, or repayment schedules, and without any basis for believing that the estate would be in a position to repay the funds transferred.[18]

The foregoing cases demonstrate that, contrary to the view adopted by the Tax Court, the mere relatedness of the parties is not a sufficient basis to support characterization of a transaction as a debt in the absence of objective evidence of indebtedness such as notes, collateral, repayment schedules, interest charges, or other measures demonstrating an intent to secure repayment. Rather, these cases demonstrate that transfers between related parties cannot be characterized as bona fide loans unless the totality of the objective evidence reveals that the transferee had an enforceable obligation to repay the sums transferred. The transactions in this case, which did not involve any notes, collateral, repayment schedule, interest charges, or book entries reflecting a loan, bear virtually none of the objective attributes which denote a bonafide

_____

18. The Commissioner argues, br. at 26-27, that Gilbert is distinguishable because in this case the trusts earned $82,764 in interest whereas in Gilbert the transferor received no interest payments. This argument is circular, as the $82,764 cannot be characterized as interest earned by the trusts unless the trusts' $2.85 million transfer to the estate can be characterized as a bona fide loan based on sufficient objective indicia of an intent to secure repayment. The argument also is unsupported by the record, as the trusts did not charge any interest but merely recovered a portion of the E.F. Hutton interest charges which they incurred in obtaining funds for the estate. Because the trusts recovered only a portion of the $133,627 in interest they paid to E.F. Hutton, see app. at 328, they subsidized the transaction, just as the transferor did in Gilbert, with no economic advantage to themselves.

23

loan, and closely resemble transfers which the courts have refused to characterize as a genuine loan because the transferor failed to take available measures to secure repayment.19 Accordingly, wefind that the objective attributes of the transactions between the trusts and the estate cannot support the Tax Court's conclusion that they gave rise to a bona fide indebtedness.

_____

19. The Tax Court cited several other cases which, like those discussed above, refused to characterize transfers between related parties as bona fide loans although they bore more objective attributes of a loan than did the transfers in this case. See In re Indian Lakes Estates, Inc., 448 F.2d 574, 578-79 (5th Cir. 1971) (finding that transfer was not a loan in economic substance despite issuance of bonds withfixed maturity dates and interest rates); Wood Preserving Corp. of Baltimore v. United States, 233 F. Supp. 600, 605-07 (D. Md. 1964) (finding that advances were not bona fide loans, despite notation of debt in ledger, as transferee made no enforceable promise to repay and could not have obtained such funds "from any reasonable banker on its own credit"), aff 'd, 347 F.2d 117 (4th Cir. 1965); Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1328-29 (1971) (holding that disbursements, although recorded on books as balance due and although partially repaid, were not bona fide loans absent notes, maturity dates or repayment schedules), aff 'd, 496 F.2d 876 (5th Cir. 1974) (table); Astleford v. Commissioner, 33 T.C.M. (CCH) 793 (1974) (finding that transfers were not bona fide loans despite interest-bearing promissory notes, notes receivable account entered on books, and significant repayments), aff 'd , 516 F.2d 1394 (8th Cir. 1975); Chism Ice Cream Co. v. Commissioner, 21 T.C.M. (CCH) 25 (1962) (finding that transfer was not bona fide loan despite ledger account entitled "note receivable" and eventual repayment of entire balance, where no promissory notes were executed or delivered, no interest was charged or paid, and no collateral was given), aff 'd, 322 F.2d 956 (9th Cir. 1963).

Notably, in each case cited by the Tax Court as well as in virtually every other case of which we are aware, it was the taxpayer who sought to establish the existence of a bona fide debt while the Commissioner contested its existence. In this case, by contrast, the typical positions are reversed and it is the Commissioner who seeks to prove the existence of a genuine indebtedness. The transfer, however, falls far short of the standards which the Commissioner has advocated and which the courts have adopted in the cases analyzing whether a transfer constitutes a debt.

24

c. Economic Reality

Our conclusion that the contemporaneous intent behind and the objective attributes of the transaction demonstrate that the transaction cannot be characterized as a bona fide loan is consistent with the economic realities surrounding the relationship between the trusts and the estate, as these realities further demonstrate that the transfers did not give rise to a reasonable expectation or enforceable obligation of repayment. As we explained in Fin Hay Realty Co. v. United States, where "the same persons occupy both sides of the bargaining table," the form of a transaction "does not necessarily correspond to the intrinsic economic nature of the transaction, for the parties may mold it at their will" in order "to create whatever appearance would be of . . . benefit to them despite the economic reality of the transaction." Fin Hay, 398 F.2d at 697. Accordingly, where the same individuals control both the transferor and the transferee, the transaction must be scrutinized according to "an objective test of economic reality" to determine its true economic nature. Id.[20]

The Tax Court acknowledged that the " `same persons occup[ied] both sides of the bargaining table' " in this case since the same individuals served as both trustees of the trusts and representatives of the estate. Geftman, 72 T.C.M. (CCH) at 821 (quoting Fin Hay, 398 F.2d at 697). As one trustee-representative explained, "[t]rustees, personal representatives, we did everything as one. I never separated it." When questioned as to whether the assets held by the trust belonged to the trusts or the estate, this trustee-representative testified that he had "no idea." App. at 60-61. However, having erroneously cited this common control as a basis for disregarding the absence of objective indicia of indebtedness, the court did not undertake an analysis of

_____

20. The rule in Fin Hay accords with the general principle that tax consequences must be determined not from "the form of the transaction," but rather from its "true substance." See Diedrich v. Commissioner, 457 U.S. 191, 195-96, 102 S.Ct. 2414, 2417-18 (1982); Commissioner v. Hansen, 360 U.S. 446, 461, 79 S.Ct. 1270, 1279 (1959); Trans-Atlantic Co. v. Commissioner, 469 F.2d 1189, 1193 (1972) (requiring that transaction amount to "debt in substance as well as in form").

25

the economic realities surrounding the transaction. See Geftman, 72 T.C.M. (CCH) at 821.

In analyzing the nature of the advances from the trusts to the estate, we cannot ignore the fact that the funds which the estate purportedly "borrowed" from the trusts were available only because the estate had funded the trusts by making the municipal bond transfers just four months before the transfers back to the estate began. The courts have refused to characterize transfers as debts where the purported debtor conveyed its funds to another entity over which it retained a degree of control only to "borrow" the same funds back a short time later. See, e.g., Wilken v. Commissioner, 53 T.C.M. (CCH) 965 (1987) (transfers from trusts to taxpayers who had funded the trust were not bona fide loans, despite promissory notes bearing interest and mortgage securing repayment, since taxpayers had retained control over trust assets and thus were `borrowing' their own assets in order to generate deductible interest payments); Ribisi v. United States, 51 A.F.T.R.2d (RIA) 83-961 (N.D. Cal. 1983) (transfers from trust to taxpayer were not a valid loan, despite promissory note, because taxpayer had used trust as "conduit" through which it cycled the funds purportedly borrowed), aff 'd, 746 F.2d 1487 (9th Cir. 1984) (table).

Nor can we disregard the degree of control which the estate exercised over the trusts' assets by virtue of the fact that the estate retained the right to reclaim any and all trust assets for its own purposes at any time. Although the estate did not directly and formally recall the $3 million municipal bond portfolio to the estate until 1987, it did so in economic substance during 1983 and 1984 by having the trusts borrow over $2.85 million against these assets worth $3 million and transferring the proceeds to the estate with no promise to repay or collateral securing repayment. The Commissioner contends, br. at 32, that the transfers should not be viewed as a de facto recall of trust assets because the estate did not issue a formal recall until well after the transfers were complete. This argument, however, focuses on the form which the representatives gave to the transactions rather than their economic reality. Because the transfers effectively conveyed back to the estate

26

virtually all of the equity in the trusts' assets, so that the proceeds from the eventual sale of the bonds had to be used primarily to satisfy the margin debt incurred on behalf of the estate, the transfers in essence depleted the equity in the trusts' portfolio and thus amounted to a de facto recall.

While the estate's representatives did not characterize the transactions as an asset recall, these individuals, who also controlled the trusts and were beneficiaries of Trust A, had every incentive to obscure the economic reality that the net economic effect of the transaction was to return all value of the trusts' assets to the estate, inasmuch as these individuals were to receive distributions from Trust A only to the extent that the trusts generated current net income. Although these individuals attempted to characterize the transaction as a profitable endeavor for the trusts in their capacity as creditors lending funds to the estate, because these individuals wielded the "power to create whatever appearance would be of . . . benefit to them despite the economic reality of the transaction," Fin Hay , 398 F.2d at 697, we cannot accept this characterization which does not accord with the economic reality that the actual effect of the transaction was to transfer $2.85 million of the equity held by the trusts back to the estate with no assurance that the estate intended to repay these sums to the trusts.

A court may ascertain the true nature of an asserted loan transaction by measuring the transaction against the "economic reality of the marketplace" to determine whether a third-party lender would extend credit under similar circumstances. Scriptomatic, Inc. v. United States, 555 F.2d 364, 367-68 (3d Cir. 1977); see also Fin Hay, 398 F.2d at 697. It is clear that no reasonable third-party lender would have extended $2.85 million of credit with no promise of repayment, no interest charges, no security, no repayment schedule, and no book entries recording a balance due, particularly if that entity did not have capital to lend but rather had to place its assets at risk to borrow the funds at rates of up to 13.25% in order to transfer them to an entity that offered no assurance that it would be in afinancial position to repay the funds. See app. at 178-98. Because this was not a transaction that "the market would accept as debt," Scriptomatic, 555 F.2d at 368, wefind that its terms

27

were defined by the relationship between the estate and the trusts as donor and beneficiary and not as debtor and creditor.21

The Commissioner argues that E.F. Hutton's willingness to lend the trusts funds which the trusts then transferred to the estate demonstrates that the transaction between the trusts and the estate was economically reasonable as a debt transaction on the open market. See br. at 33. We disagree. E.F. Hutton lent funds to the trusts on terms radically different from the terms on which the trusts advanced the same funds to the estate. E.F. Hutton secured its loans to the trusts with $3 million in municipal bonds as collateral, charged the trusts substantial amounts of interest, and collected payments monthly. The trusts, by contrast, made no attempt to obtain a security interest in any of the estate's assets, although the estate had real estate holdings that might have served as collateral. Moreover, the trusts did not charge the estate interest or require regular payments, but rather received only four payments in amounts that only partially reimbursed the trusts for the costs they incurred in borrowing from E.F. Hutton. Thus, the contrasts between E.F. Hutton's loans to the trusts, and the trusts' transfers to the estate in fact demonstrate that the latter transaction did not create a debtor-creditor relationship.

Moreover, the terms on which the trusts transferred the funds to the estate differed not only from the terms on which third parties would lend those funds, but also from the terms on which the trusts lent funds to other related parties. Edith Kermer, a trustee and beneficiary of Trust B,

_____

21. We recognize that credit may be extended between related parties on terms that differ from those that would exist on the open market. Thus, while the Commissioner is correct, br. at 33, that a transfer need not be profitable for the transferor in order to constitute a bona fide loan, in this case the transfer was not merely unprofitable in the sense that it did
not generate any interest income for the trusts. Rather, it required the trusts to incur substantial costs and risks to their assets with no reasonable expectation that even the principal amount would be repaid. Under the circumstances, which reveal no obligation to repay and no expectation of repayment, we cannot characterize the transaction as a bona fide extension of credit.

obtained a loan from the trusts by executing a mortgage on her home in favor of the trusts and a written agreement to repay the trusts by certain dates at an interest rate of one percent above the rate charged to the trusts by E.F. Hutton. See app. at 416-19. The absence of comparable terms surrounding the transfers made to the estate further demonstrates that in economic substance these transfers were not loans made with a reasonable expectation of repayment, but rather were a conveyance of trust assets back to an estate which effectively had exercised its right to reclaim such assets for its own purposes.

The economic realities surrounding the transaction, the objective features of the transfer, and the lack of contemporaneous unconditional intent to create an enforceable debt all support Geftman's assertion that the transactions between the trusts and the estate did not give rise to a genuine indebtedness. In the absence of any evidence establishing a bona fide debtor-creditor relationship between the estate and the trusts, we must reject as clearly erroneous the Tax Court's conclusion that the $82,764 which the estate paid to the trusts constituted taxable interest income earned by the trusts in their capacity as creditors rather than non-taxable distributions received by the trusts in their capacity as beneficiaries of an estate that had no distributable net income.

B. Mortgage Transactions

The Tax Court found that the trusts earned additional taxable income in the form of interest paid on the La Playa and Blue Grass condominium mortgages. Although Berkley, one of the estate's wholly owned corporations, held title to these mortgages and collected all mortgage payments, the court found that Berkley held the mortgages and processed these payments merely as an agent or nominee for the trusts who were the beneficial owners of the mortgages. The court based its conclusion that the trusts were the beneficial owners of the mortgages on an "adjusting journal entry" indicating that Berkley had transferred the mortgages to the trusts as a "partial debt settlement," and on a "work paper" attributing to the trusts the $90,596 in mortgage payments which Berkley collected. See Geftman,

29

72 T.C.M. (CCH) at 821-22. Based on these documents, the court found that the "trusts clearly owned the . . . mortgages," so that the $59,000 which Berkley transferred to them constituted taxable interest income generated by those mortgages rather than nontaxable transfers from an estate with no distributable net income. See id. 22

While it is undisputed that Berkley held title to the mortgages at all relevant times and did not formally assign them to the trusts, the true ownership of the mortgages and the proper attribution of the income derived therefrom does not depend on legal title, but rather turns on"actual command over the property" and the right to receive the "actual benefit" that accrues from ownership. Frank Lyon Co. v. United States, 435 U.S. 561, 572-73, 98 S.Ct. 1291, 1298 (1978); accord Cepeda v. Commissioner, 67 T.C.M. (CCH) 2181, 2183-84 (1994), aff 'd, 56 F.3d 1384 (5th Cir. 1995) (table). Accordingly, we must determine whether the trusts acquired "the benefits and burdens of the incidents of ownership" of the mortgages based upon "the objective evidence provided by the . . . overt actions" with respect to the mortgages. Cordes v. Commissioner, 68 T.C.M. (CCH) 356, 358 (1994) (citations omitted); accord Frank Lyon Co., 435 U.S. at 572-73, 98 S.Ct. at 1298.

Upon analyzing these factors, we conclude that, contrary to the representations in the adjusting journal entry and the work paper, the objective evidence as to control over the mortgages and the income derived therefrom clearly demonstrates that Berkley and BOP retained all incidents of beneficial ownership of the mortgages, precluding reliance on the documents cited by the Tax Court.

1. Documentary Evidence

The Tax Court's conclusion that the trusts had acquired a beneficial interest in the mortgages rested in significant

_____

22. The court initially found that the trusts received $90,596 in mortgage interest income, consisting of the entire amount attributed to the trusts on the work paper, but corrected its finding on reconsideration in light of the stipulation that only $59,000 had been transferred to the trusts. See app. at 436-37.

part on the June 11, 1985 "adjusting journal entry," which was prepared over three months after the trusts' tax year ended on February 28, 1985. The adjusting journal entry refers only to the La Playa mortgages with no reference to the Blue Grass mortgages, contrary to the court'sfinding that this document revealed the trusts' ownership of both sets of mortgages. See supp. app. at 40. 23

Most significantly, however, records of Berkley and BOP prepared during the relevant tax year controvert the adjusting journal entry's representation that ownership of the mortgages had been transferred to the trusts. A document entitled "BOP, Inc. et al Schedule of Real Estate Holdings As of January 31, 1985" identifies BOP as the owner of the La Playa and Blue Grass mortgages which were titled to Berkley. See app. at 408-15. The schedule, which contained numerous footnotes explaining the status of various properties, contained no notation indicating that the trusts held an interest in the La Playa or Blue Grass mortgages. While the Commissioner contends that the"et al" after BOP's name could be construed to include the trusts, the Commissioner relies on the testimony of a representative who conceded that he had no knowledge of what the "et al" meant. App. at 76-77. We reject the Commissioner's suggestion that the schedule of BOP holdings can be construed as comprising assets owned by the trusts, since the trusts undisputedly held a mortgage on the home of Edith Kermer, yet the Kermer mortgage was not identified on the list of BOP's holdings. 24 Accordingly, we find that this document identifying BOP as the owner of the mortgages one month before the end of the tax year precludes reliance on the "adjusting journal entry" which,

_____

23. The Commissioner contends that the adjusting journal entry is supported by the minutes of a representatives' meeting held September 5, 1984, stating that the mortgages had been "bought outright" by the trusts. See app. at 135. While the September 1984 document alludes to a mortgage transfer, the inconsistency as to whether the mortgages were purchased or were transferred to settle a debt undermines the Commissioner's assertion that these documents accurately describe a transaction that actually occurred.

24. The "et al" apparently refers to BOP's sister corporation Berkley which held title to some of the properties identified in the document.

six months later, asserted that the mortgages had been transferred to the trusts during that tax year.

2. Objective Incidents of Beneficial Ownership

a. Transactions Involving the Mortgages

Even if Berkley and BOP had recorded consistent, contemporaneous documents stating that the mortgages had been transferred to the trusts, such documents would be insufficient to establish the trusts' ownership of the mortgages for tax purposes unless the "objective evidence" as to the "overt actions" with respect to the mortgages, Cordes, 68 T.C.M. (CCH) at 358, demonstrated that the trusts enjoyed "actual command" over the mortgages and the right to receive the "actual benefit" of owning them. Frank Lyon Co., 435 U.S. at 572–73, 98 S.Ct. at 1298. The Tax Court, in relying on documents reflecting the purported mortgage transfer, did not analyze the significance of the numerous overt acts in which the mortgages were assigned, pledged and sold to third parties. The court thus failed to make the essential determination as to which party retained actual command over the mortgages and the right to receive the benefits of owning them. Upon examination of the overt acts involving the mortgages, it becomes apparent that, consistent with the schedule reflecting BOP's ownership of the mortgages, Berkley and BOP retained actual command over the mortgages and the benefits flowing therefrom.

Within five days of the June 11, 1985 journal entry reflecting the purported mortgage transfer, BOP and Berkley, acting jointly, pledged the mortgages to Ohio Savings Bank to secure a loan and executed a "Collateral Assignment" of the mortgages dated June 16, 1985, which they recorded in public records. In the course of this transaction, Berkley and BOP held themselves out as the "sole and lawful owners" of the mortgages"free and clear of any and all claims" and possessing the "full right and lawful authority to deliver, pledge, assign, grant, convey and transfer" the mortgages. Berkley and BOP used the proceeds of the sums borrowed against the mortgages for

32

their own business activities, completing the process of hypothecating the mortgages with no participation or authorization from the trusts. See app. at 389–97, 133, 29–36, 43, 63–68.

One year later, Ohio Savings Bank reassigned the mortgages to BOP and Berkley in a written reassignment to them in their names, which they recorded in the public records with no mention of the trusts. Shortly thereafter, Berkley and BOP sold the mortgages to Horowitz Finance Corporation and Fleet National Bank, again representing themselves as the sole lawful owners, seeking no participation from the trusts, and using the proceeds for their own purposes. See app. at 29–38, 63–68, 41, 90, 398–407.25

These transactions clearly demonstrate that, despite the "adjusting journal entry" stating that the trusts owned the mortgages, Berkley and BOP had full command over those assets and over the beneficial incidents of owning them, freely pledging them to obtain credit and selling them to raise cash for their own undertakings. Courts have refused to recognize purported asset transfers where the assets remain within the control of the purported transferor and remain subject to claims of the purported transferor's creditors, as was the case here where Berkley and BOP continued to enter into transactions with respect to the mortgages and pledged the mortgages to their creditors. See In re Johnson, 88 T.C. 225, 236–37 (rejecting assertion that estate had transferred assets where assets remained sufficiently within control of estate that they "would not be insulated from the claims of [its] creditors"), aff 'd, 838 F.2d 1201 (2d Cir. 1987); Donisi v. Commissioner, 26 T.C.M. (CCH) 327, 331 (1967) (disregarding asset transfer recorded

_____

25. Berkley and BOP used a large portion of the proceeds to satisfy their debt to Ohio Savings Bank and used the remainder to pursue their real estate endeavors. While one of the estate's representatives asserted that the trusts had authorized the various dispositions of the mortgages, he conceded that all relevant documents referred only to the estate, Berkley and BOP. See supp. app. at 12–16. In light of the substantial evidence of transactions carried out exclusively by Berkley and BOP, the record cannot support a finding that the trusts exercised any control over the decisions with respect to the mortgages.

on books where purported transferor subsequently"took out two loans using the [assets] as collateral"), aff 'd, 405 F.2d 481 (6th Cir. 1968).26 Because Berkley and BOP retained all incidents of beneficial ownership including the power to pledge the mortgages as collateral, sell them to third parties and retain the proceeds of these transactions while the trusts did not enjoy any of these incidents of ownership, we find that the objective evidence of actual control over the mortgages precludes a finding that the trusts were the true owners of the mortgages. See Frank Lyon Co., 435 U.S. at 572–73, 98 S.Ct. at 1298. 27

_____

26. The Commissioner contends, br. at 38, that this case is distinguishable from Johnson because Berkley paid the trusts $59,000 of the income generated by the mortgages, thus providing an objective act to corroborate the purported transfer of beneficial ownership. We disagree. The very issue in dispute is whether the $59,000 transferred to the trusts can be characterized as interest income generated by the mortgages, since in the absence of evidence that the trusts owned and controlled the mortgages, the transfers from the estate cannot be characterized as mortgage interest income. In this case, as in Johnson, there is no evidence that the trusts assumed the right to control the mortgages as suggested in book entries. Thus the transfer of $59,000 is immaterial.

27. The Commissioner argues, br. at 37–38, that the hypothecation and sale of the mortgages to third parties should be accorded "minimal weight" because they occurred after the end of the relevant tax year. We disagree, and find Berkley's and BOP's complete control of the mortgages as of June 16, 1985, highly probative of the locus of control during the tax year ended February 28, 1985, especially since the record contains no indication of any intervening change in the status of the mortgages. The Commissioner's argument is particularly unpersuasive in light of the Commissioner's extensive reliance on the journal entry dated June 11, 1985, as evidence bearing on ownership during the tax year ended February 28, 1985. The Commissioner also asserts that Berkley's and BOP's dispositions of the mortgages are irrelevant because they involved "nothing more than transfer of bare legal title." Br. at 38. However, as the estate's representatives conceded, in pledging the mortgages as collateral to Ohio Savings Bank, Berkley and BOP placed the value of the mortgages directly at risk in the event of a default, see app. at 47, 69–70, 123, 170–71, and in selling the mortgages Berkley and BOP relinquished all control over them. There is nothing in the record to support the assertion that these transfers involved only the bare legal title of the mortgages.

b. Control Over Mortgage Income

Berkley's control over the revenues generated by the mortgages further demonstrates that the trusts did not hold the incidents of beneficial ownership of the mortgages. Contrary to the Tax Court's finding that Berkley merely "serviced" the mortgages by collecting mortgage payments and forwarding them to the trusts, see Geftman , 72 T.C.M. (CCH) at 821, the record clearly demonstrates that Berkley retained exclusive control over the mortgage payments which it collected without accountability to the trusts. The only document indicating that Berkley collected the mortgage payments on behalf of the trusts consists of a single page, which the court described as a "work paper," id. at 822, listing cumulative totals of the payments made on the La Playa and Blue Grass mortgages through December 31, 1985, and through the end of fiscal year 1985, and attributing these cumulative amounts to the trusts. See supp. app. at 39. As one of the estate's representatives conceded, the cumulative nature of this document reveals that it could not have been prepared before December 31, 1985, see supp. app. at 33, ten months after the close of the trusts' fiscal year.

In contrast to this document retrospectively attributing a cumulative amount to the trusts, the documents prepared during the tax year in the ordinary course of Berkley's business did not attribute to the trusts any of the mortgage payments which Berkley collected. See app. at 329–34. These documents accounting for each mortgage payment received, with no reference to the trusts' purported interest therein, undermine the Commissioner's assertion that Berkley "accounted for the interest received on the La Playa and Blue Grass condominiums as having been received on account of the trusts." Br. at 37.28  In the absence of any

_____

28. In support of this assertion, the Commissioner cites only the "work paper" prepared after the end of the tax year and the testimony of one of the representatives who conceded that he was"not familiar with the books" in which Berkley accounted for the mortgage payments it collected. App. at 78. This evidence cannot support a finding that Berkley accounted for the mortgage payments as having been received on behalf of the trusts, particularly since the documents recorded during the tax year do not reflect such a practice.

35

contemporaneous documents attempting to account for the trusts' purported mortgage income separately from Berkley's other income, the single document retrospectively characterizing a cumulative amount as income to the trusts fails to establish that the trusts enjoyed a beneficial interest in that income.

Berkley's handling of the actual funds received further undermines the Commissioner's assertion that Berkley merely processed payments belonging to the trusts. While Berkley collected regular monthly mortgage payments whose total amount increased steadily as additional condominium units were sold at the La Playa and Blue Grass developments, see app. at 99, Berkley's transfers to the trusts did not correspond to the amounts purportedly received on their behalf, but rather occurred at irregular intervals and in haphazard, fluctuating, and sometimes nominal amounts, which, as Geftman accurately notes, "bore no reasonable relationship to the regular remittance of monthly principal and interest payments which would have been received by a legitimate mortgage servicing company." Br. at 41.29

Significantly, Berkley forwarded to the trusts only $59,000 of the $90,596 which it later characterized as payments collected on behalf of the trusts. As representative Love explained, Berkley had no obligation to forward the mortgage payments to the trusts each month, but rather remitted the money "as we saw fit, as we needed

_____

29. The transfers occurred as follows:

| | |
|---|---|
| Oct. 17, 1984 | $12,000 |
| Nov. 9, 1984 | $ 5,000 |
| Jan. 4, 1985 | $25,000 |
| Jan. 29, 1985 | $ 1,000 |
| Feb. 5, 1985 | $14,000 |
| Feb. 14, 1985 | $ 1,000 |
| Feb. 20, 1985 | $ 1,000 |
| | _____ |
| Total | $59,000. |

Although the trusts' ledger contained accounts for recording interest income, the trusts did not record the $59,000 as such, but rather recorded this sum in an account simply entitled"Berkley Mtg. Corp." See app. at 384-85.

36

the cash to run the business." App. at 102. This testimony reveals that Berkley did not function merely as a nominee or agent processing payments on behalf of its principal, but rather was free to use the money it collected as it saw fit to further its own business purposes. Berkley's full control over the income from the mortgages demonstrates that Berkley, rather than the trusts, enjoyed this incident of beneficial ownership.

As the Tax Court acknowledged, "[t]he owner of property is the one who will reap the benefits of ownership." Geftman, 72 T.C.M. (CCH) at 822. In this case, the trusts did not hold title to the mortgages, did not participate in transactions pledging them as collateral and selling them, did not receive any of the proceeds from those transactions, and did not have control over the monthly mortgage payments which Berkley collected and retained for its own business purposes, forwarding funds to the trusts only when it chose to do so. In light of this evidence that the trusts did not enjoy any of the incidents of beneficial ownership of the mortgages and that the mortgages remained within the exclusive control of Berkley and BOP, we find that the Tax Court clearly erred in concluding, based on an adjusting journal entry and a work paper prepared well after the close of the tax year, that the trusts were the true owners of the mortgages. Because the trusts did not hold any beneficial interest in the mortgages, we must reject the Tax Court's conclusion that the $59,000 transferred to the trusts constituted taxable mortgage interest income earned by the trusts as owners of the mortgages rather than non-taxable transfers from an estate that had no distributable net income.

C. Effect on Appellant's Tax Liability

Section 662(b) of the Internal Revenue Code provides that income which is taxable in the hands of a trust is taxable in the hands of the trust's beneficiary. Thus, when a trust receives both taxable and non-taxable income, the trust's distributions to its beneficiaries are treated as consisting of both taxable and non-taxable elements, in the same proportion as the taxable and non-taxable elements of the trust's net income. See 26 U.S.C. S 662(b); Treas. Reg.

37

S 1.662(b)-1. The Tax Court found that 36% of the distribution to Geftman was taxable, based on its conclusion that 36% of Trust C's net income consisted of taxable interest income generated by the margin transactions and the La Playa and Blue Grass mortgages, while the remainder consisted of tax-exempt income earned on the trusts' municipal bonds. See app. at 436-38.30

However, for the reasons discussed above, we find that the Tax Court erred in characterizing the transfers to the trusts of $82,764 in connection with the E.F. Hutton margin transaction and $59,000 in connection with the mortgages as taxable income. Because these amounts were not paid to the trusts as a bona fide creditor or a bona fide holder of the mortgages, the transfers can be characterized only as non-taxable distributions from an estate which had no distributable net income, rendering all of the trusts' income, and thus all of the distribution to Geftman, non-taxable. See 26 U.S.C. S 652(a); Treas. Reg. S 1.652(a)-2(b).

IV. CONCLUSION

For the foregoing reasons, we will reverse the Tax Court's decision holding Geftman liable for an income tax deficiency, as the distribution from Trust C which gave rise to the finding of a deficiency consisted entirely of non-taxable income. Consequently, we will vacate the Tax Court's imposition of additions to tax pursuant to 26 U.S.C. SS 6651 and 6654, as the court's application of these provisions rested on its finding of an underlying income tax liability. We will remand the matter to the Tax Court for entry of a decision in accordance with this opinion and for such other proceedings as may be appropriate.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

30. For an explanation of the calculations underlying this 36% figure, see note 7, supra.